RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LINDA STERMER,

*Petitioner-Appellee*,

*v.*

No. 19-1075

MILLICENT WARREN, Warden,

*Respondent-Appellant*.

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-14013—Arthur J. Tarnow, District Judge.

Argued: December 3, 2019

Decided and Filed: May 15, 2020

Before: MOORE, CLAY, and SUTTON, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Linus Banghart-Linn, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Wolfgang Mueller, MUELLER LAW FIRM, Novi, Michigan, for Appellee. **ON BRIEF:** Linus Banghart-Linn, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Debra K. Hampton, HAMPTON LAW OFFICE, PLLC, Edmond, Oklahoma, for Appellee.

CLAY, J., delivered the opinion of the court in which MOORE, J., joined. SUTTON, J. (pp. 46–55), delivered a separate dissenting opinion.

---

**OPINION**

---

CLAY, Circuit Judge. Petitioner Linda Stermer was convicted of felony murder in the course of committing an arson and was sentenced to life in prison. The State of Michigan charged her with killing her husband by setting both him and their house on fire. At trial, the state used a fire expert to support its claim of arson, but Stermer's counsel never retained or consulted with an expert to rebut this evidence. In his closing arguments, the prosecutor repeatedly branded Stermer a liar, misrepresented her testimony, and disparaged her while bolstering other witnesses. Stermer's counsel did not object.

After a direct appeal and a motion for post-conviction relief in state court, Stermer filed a petition for habeas corpus in the Eastern District of Michigan pursuant to 28 U.S.C. § 2254. The district court, over the state's objection, held an evidentiary hearing. After that hearing, the court granted Stermer's petition based on her claims of prosecutorial misconduct and ineffective assistance of counsel. The state appealed.

While the district court improperly held an evidentiary hearing and applied an incorrect standard of review to Stermer's petition, that does not affect this Court's *de novo* review of her claims. Even with the significant deference afforded to state court decisions under habeas review, Stermer is entitled to relief on her prosecutorial misconduct and ineffective assistance claims. Accordingly, we affirm the district court's grant of a conditional writ of habeas corpus, meaning that Stermer is entitled to a new trial.

**I. BACKGROUND**

**A. The Death of Todd Stermer**

Linda and Todd Stermer were married for fourteen years. But this was not a happy marriage. On January 6, 2007, Todd discovered that Linda was having an affair with a co-worker named Chris Williams and told her that he wanted a divorce.

The next morning, according to Linda, she and Todd argued, this time about a financial matter.  Linda then went to a gas station, filled her Chevy Blazer with fuel, and bought breakfast.  The gas station attendant testified that the back window of Linda's truck was open, and at one point it appeared that Linda was pumping gas through the back side of the vehicle, and not into the gas tank.  Linda had previously filled containers with gasoline at that station.

Back at the house, Linda told her sons they had to leave the house because she and Todd needed to discuss some things.  (*Cf.* Trial Tr. vol. 4, R. 24-10 at PageID #1510–11 ("Q. . . . [W]ere you given a reason as to why you guys had to be out of the house?  A. Because they were getting divorced and they needed to decide how to split everything up.").)  According to Linda, she later went into the basement to do some laundry.  There she found a towel, placed there by Todd, that smelled like fuel.  During this time, Linda said that Todd remained in the living room but was yelling at her from there.

At some point, Todd's yelling turned to painful screaming, and Linda ran upstairs.  She found a fire spread across the house, and Todd himself was on fire.  She ran outside and got into the family van to go get help.

At around this time, neighbors saw smoke and flames coming from the Stermers' house and drove over to help.  When they arrived, the neighbors saw the Stermer's van backing down the driveway, but then stop and drive forward instead (away from them).

According to Linda, once she got in the van, she started to reverse down the driveway, but then saw Todd outside the house and covered in flames.  Linda got out of the van and tried to get Todd to lie down, but realized she was unable to help him and needed to get outside aid.  She got back in the van but was stuck in the mud and could not reverse, and so she drove forward instead to get unstuck.  At some point, she saw Todd lying on the ground (no longer on fire) and got back out of the van to help him.  Based on Todd's injuries and on blood later found on the front driver's side of the vehicle, Linda had struck Todd with the van.

At this point, Linda saw her neighbors heading toward them and screamed at them to call 911.  When the neighbors found Todd, he was severely burned and largely naked, wearing only

boots and a pair of sweatpants pulled down to his ankles. One of the neighbors grabbed clothes from his vehicle and draped them over Todd to keep him warm.

Emergency responders eventually arrived and provided aid to Todd, who was unresponsive. They moved Todd away from an oil tank near the house (in case that too caught fire), but soon after moving him, Todd stopped breathing. Although the first responders performed CPR, he was pronounced dead at the scene.

Dr. Michael Markey later performed an autopsy of Todd Stermer and found the cause of death to be a combination of burns and smoke inhalation. Additionally, Dr. Markey found blunt-force injuries to Todd's head, but could not say if these injuries were caused by him being struck by an object multiple times, being struck by a vehicle, or both. While Todd's blood tested negative for controlled substances, the toxicology lab found hydrocodone (the opioid in Vicodin) in his urine. This suggests that the hydrocodone was ingested some hours or days before his death, since the drug had been cleared from his blood but remained in his urine.

On the day of the fire and again two days later, Linda Stermer was interviewed by a detective with the sheriff's department and conveyed her version of events. She was also interviewed by private investigators hired by the insurance company for her homeowner's policy, and these interviews were recorded and transcribed. When speaking to the insurance investigators, Stermer was asked if she had any opinions as to what could have started the fire. In response to this, she said, "I feel like maybe—Todd yelled at me once during the day and told me that nobody else would ever have me and I just—I think maybe that he meant for both of us to—I don't think I was supposed to be here." (Trial Tr. vol. 2, R. 24-8 at PageID #1069–70.)

Stermer also told the investigators that Todd had an oil lamp and candles burning in the house, and that he would often have to bleed fuel from the furnace, which could explain how it got on the towel in the laundry (and perhaps on Todd as well). The insurance investigators tested two towels from the home's washing machine: both tested positive for gasoline.

**B. The Criminal Trial**

On June 5, 2009—over two years after the fire—Stermer was arrested and charged with premeditated murder and with felony murder in the course of committing arson (both first-degree murder under Michigan law). *See* Mich. Comp. Laws § 750.316(1)(a)–(b). According to the prosecution, Stermer either sedated Todd or knocked him unconscious before dousing him with gasoline and setting him on fire. And when Todd escaped from the fire, Stermer ran him over with her truck. On the other hand, the defense argued that the fire was either an accident or was intentionally set by Todd, and that Stermer accidentally struck Todd with her vehicle.

At trial, the story of Todd's death was presented to the jury. While Stermer did not testify, her version of events was relayed through her interviews with the insurance investigators, which were admitted as trial exhibits and large portions of which were read into the record.

Aside from the witnesses discussed above, several others testified in support of either the prosecution or defense theories of the case. Most notably, the prosecution called a fire investigator as an expert witness:

> Detective Sergeant Scott Leroy, who was employed by the Michigan State Police Fire Investigation Unit, testified for the prosecution as an expert in the field of determining cause and origin of fires. He investigated the Stermer house fire. Detective Leroy concluded that the fire originated in the first-floor living room and was intentionally set. Detective Leroy based these conclusions on the speed of the fire, a comparison of areas with the most damage versus areas with the least damage, the time of day, and the fact that two adults were at home. He could not determine whether accelerants were present on the living room floor because the floor was consumed by the fire. A canine search team found no ignitable liquid residue in the home.

*Stermer v. Warren*, 360 F. Supp. 3d 639, 649 (E.D. Mich. 2018).

Todd's clothing tested positive for gasoline, but Linda's clothing did not. The fire expert concluded that the fire had been intentionally set and that Todd was at the center of the fire. Stermer's trial counsel did not call his own fire expert to rebut these conclusions.

Beyond this expert testimony, the prosecution called Kate Fox, a former friend of Linda. According to Fox, at some point before the fire, Linda told her that Todd was "physically and

emotionally abusive, and that she had contacted a divorce attorney." *Id.* Linda also said she had spent years thinking about "how to get rid of" Todd, including possibly running him over with a car. *Id.* Perhaps most damningly, Fox testified that after the fire, Linda had called her one night and asked her to borrow a flashlight, because she needed to get into her house and remove a coffee cup containing a sedative before the police found it.

On cross-examination, Fox admitted that her relationship with Stermer fell apart shortly after the fire when Stermer switched to a different work shift, meaning they could no longer carpool. Fox viewed this as a betrayal, since the plan was for them to both change shifts together. She also admitted that they argued about a $5,000 debt Fox claimed Stermer owed her, which ultimately led to Fox being charged with assaulting Stermer. Finally, Fox testified to having mental health problems.

The prosecution also called Chris Williams, who testified about his affair with Stermer and what she told him about the fire. But according to Williams, Stermer had maintained that she did not set the fire and was not involved in Todd's death.

To further support its theory, the prosecution called two jailhouse informants: Veronica Navarro Tracy and Dardeda Gordon. Tracy said she overheard a conversation in which Stermer said something about hitting Todd with a frying pan and being sorry for this. On cross-examination, though, this largely fell apart: Tracy said she was uncertain whether the person she overheard was Stermer at all, and Tracy could not say whether she heard anything other than this person repeating how sorry she was.

Gordon's testimony fared better. She said that after Stermer told her several conflicting stories about Todd's death, Stermer admitted to the murder. According to Gordon, Stermer said she and Todd had argued the day of the fire and that she struck him in the head with something, and later started the fire with gasoline while Todd was sleeping.[1] On cross-examination, though, both Tracy and Gordon admitted to mental health issues, and Gordon said she suffered from memory problems.

---

[1]Based on Gordon's testimony, this "sleeping" was separate from him being struck during their argument, though there may have been "medication involved." (Trial Tr. vol. 3, R. 24-9 at PageID #1290–93.) The testimony is unclear on several of these points.

Although she was called by the prosecution, Todd Stermer's mother testified that two of Todd's previous homes had burned down. According to the defense, this fact, combined with Todd's significant financial problems, indicated that these previous fires were likely arson, and thus that Todd was likely the arsonist here as well.

The defense also called several witnesses to discredit the prosecution's testimony. Kate Fox's brother described Kate as untrustworthy and said that she would lie in order to get revenge if she felt wronged by someone. Several jail inmates housed with Stermer also testified that she never discussed her case in jail and had never spoken with Dardeda Gordon. Finally, several defense witnesses testified as to Stermer's "honesty and peaceable nature." *Id.*

In his closing argument, the prosecutor argued that the circumstantial evidence, when viewed as a whole, supported Stermer's guilt. He took a particular focus on Stermer's statements to the insurance investigators, suggesting that she lied to them in order to cover up her role in the fire and her husband's death. (*See* Trial Tr. vol. 5, R. 24-11 at PageID #1698 ("We'll examine her ability or inability to tell the truth when she's being interviewed by the insurance investigators . . . .") .) Before describing these statements, the prosecutor said the following:

> I'm going to be talking about statements that Linda Stermer made. What I want to caution you on is as we look at this, we know she is a liar. There is no question but that she's a liar and will lie when it suits her, okay. Even if we didn't know that, we have to take a cautious view of a statement by someone who is accused of a very serious crime. Might they not say things that they perceive are going to be favorable to them? But we know that she's a liar and in looking at some of those statements, the tendency and what I want you folks not to do is to adopt them as fact because if you do, they are going to be very difficult to reconcile maybe with other parts of it. So as you're looking at the evidence, keep in mind anything she says is suspect. She's a liar. And we'll see not only the direct lies that she told, but we'll align our common sense to other things that she said to see if it makes sense and if it indicates that she's a liar.

(*Id.* at #1704.)

After this introduction, the prosecutor marched through several statements Stermer made to the insurance investigators, suggesting that these statements were both scripted and implausible, and repeating his belief that Stermer was a liar. (*See, e.g.*, *id.* at #1705–07 (discussing Stermer's statement that Todd said "nobody else would ever have [her]" at the time

the fire started).)  He also noted that Stermer lied about her affair with Williams.  After discussing these statements, the prosecutor summarized his thinking:  "But why are we getting multiple inconsistent versions?  Okay.  I think that's the question we have to be asking and I think the answer is because we're dealing with a liar who has things to hide."  (*Id.* at #1713; *see also id.* at 1714 ("You don't go back and forth telling different stories depending on who you are talking to.  And that's another indication of her inability to tell the truth.").)

In addition to disparaging Stermer's credibility, the prosecutor also argued that other witnesses were trustworthy by comparison.  For example, he said the following about the gas station attendant:

> She's asked whether . . . she got gas that morning in a can . . . . She says, no, she did not.  You had the opportunity to see Cindy DeLoach [the gas station attendant].  You had an opportunity to judge her credibility.  I would submit that she certainly appears to be a very credible person who has recall of the incident, has no reason to make anything up, and by all appearances, Linda Stermer with the hatch up standing at the back of her vehicle with a nozzle in hand.

(*Id.* at #1708.)  He similarly said that the jailhouse informants had "no incentive to lie" and that there was "nothing in it for them" to fabricate their testimony.  (*Id.* at #1721.)

The prosecutor also questioned why Stermer attempted to drive to get help instead of calling for aid, asking why she got into the vehicle without her cell phone:

> One of the other factors we may want to consider is her purse is in the vehicle.  Possible certainly, but very convenient.  Unfortunately, the lady who has two cell phones has neither one of them with her to call for help.  The phones are in the van according to go her [sic].  Possible?  Yes.  Convenient?  Very.  The boys say that wasn't the habit to keep the keys in the van.  In fact, Cory [Stermer's son] said not only that, but also that her purse was on the counter.

(*Id.* at #1714.)  The district court noted, however, that "the State failed to present *any* evidence at trial that there was a cell phone in the van when Petitioner fled the house." *Stermer v. Warren*, 360 F. Supp. 3d at 656.

The prosecutor also later revisited Stermer's phones and her failure to call for help:

> [T]here's a phone in the bottom level of the house.  911.  How long does that take?  Even if the house is on fire upstairs, how long does that take?  Granted the excitement of the moment, maybe you just panicked and don't do it, but the fact remains, she didn't do it.  The lady has the two cell phones also, doesn't have those available apparently to make that call to 911.  Couple seconds.

(Trial Tr. vol. 5, R. 24-11 at PageID #1722.)

After discussing the remaining circumstantial evidence against Stermer, the prosecutor ended his closing argument as follows:

> [S]he has told lie after lie after lie. . . . [A]s you look at the evidence in this case, everything points to Linda Stermer, everything.  There is nothing to suggest that it points to Todd Stermer and if you have—if you think you might have a reasonable doubt, it has to be a doubt based on a reason.  Ask yourself what would that reason be.  What reason is there to believe that Todd Stermer was responsible in some way for his own demise.  Is there anything that we've heard other than from a liar, and even then not a real good story, that would lead us to believe that, to believe that there is reason to believe that Todd Stermer caused this?  I would suggest that there is nothing.  I would suggest that we are dealing with a diabolical, scheming, manipulative liar and a murderer.  Any statement of any consequence that she has made is suspect, either shown to be directly a lie, or common sense tells us that it doesn't make any sense.  I would ask you to return a verdict of guilty.

(*Id.* at #1723–24.)  Stermer's lawyer never objected to these statements.

In the defense's closing, Stermer's trial counsel emphasized the weak and circumstantial nature of the prosecution's case, suggesting that the fire was either accidental or, if deliberately set, was started by Todd.  In support of this, Stermer's lawyer pointed to the testimony of Todd's mother, which showed that two of Todd's previous homes had also burned down.  (*See* Trial Tr. vol. 5, R. 24-11 at PageID #1739–40  ("Two other properties Todd was involved in burned down. Two. This is his third. I dare say that nobody else has had three, I dare say nobody has had two, and I will be hard pressed to find somebody who has had one house burn down, but three?  Three.").)  Near the end of his closing, counsel repeated this point, arguing that Todd was more likely to have started the fire.  (*See id.* at #1756 ("Who's had two other houses burn down before?  Todd Stermer.  Who do you think is more likely to do it again, the person who's never

done it or the guy that's done it twice before?"); *id.* at #1757 ("[The fire] was intentionally set by Todd Stermer. He has a history of doing this, two other homes that burned down. . . . He needs it to get himself out of the hole financially and he needs it [because of the] problems in his marriage.").)

On rebuttal, the prosecution pushed back on this theory of the case:

One of the other things that I want to clear up right away, and [defense counsel] keeps making reference to two previous fires, two previous fires, two previous fires, the second of which Linda Stermer is living with [Todd] and even by her own version it's not an arson, nor was the first one. There is no evidence of that either. Okay. For a moment we want to start making arguments, well, hey, somebody had a prior fire. She was there too so she knows about fires, you know. But there is no evidence that it was arson, so it's nonsense.

(*Id.* at #1764–65.)

The prosecutor finished by summarizing the evidence and again calling Stermer a liar: "She had the motive; she had the opportunity; she got the gas; she sent the boys away; she didn't call for help; she ran him over and then she told lie after lie after lie." (*Id.* at #1771.)

The jury convicted Stermer of both premeditated and felony murder (though the trial court later vacated the premeditated murder charge as duplicative). She received the mandatory sentence of life imprisonment without the possibility of parole. *See* Mich. Comp. Laws § 750.316(1).

## C. State Post-Conviction Proceedings

On direct appeal, Stermer raised three grounds for reversal: (1) a state-law procedural issue, (2) the trial court's refusal to enter a directed verdict for insufficient evidence, and (3) the trial court's failure to order a new trial because the verdict was against the great weight of the evidence. The Michigan Court of Appeals affirmed on all three grounds, *People v. Stermer*, No. 297057, 2011 WL 2507848, at *4 (Mich. Ct. App. June 23, 2011) (per curiam), and the Michigan Supreme Court denied leave to appeal, *People v. Stermer*, 805 N.W.2d 434 (Mich. 2011) (mem.).

Around ten months later, Stermer filed a *pro se* habeas corpus petition in the Eastern District of Michigan under 28 U.S.C. § 2254.  The petition raised several grounds for relief challenging the state's proof against her and arguing that the prosecution had mischaracterized the evidence.  The district court found that Stermer had not yet exhausted one of her claims, and so it held her petition in abeyance for her to raise the claim in a state post-conviction proceeding.

After several extension requests with the district court, Stermer filed a *pro se* motion for relief in the state trial court under Michigan Court Rule 6.502.  In her sworn petition, Stermer raised five grounds for relief: (1) Stermer was denied a fair trial because the testimony of the state's fire expert was unreliable; (2) the prosecutor committed misconduct by, among other things, denigrating Stermer, vouching for witnesses, and making false statements during closing arguments; (3) Stermer's trial counsel was constitutionally deficient for, among other things, failing to object to the prosecutor's misconduct and for failing to employ his own arson expert; (4) appellate counsel was deficient for not raising these stronger arguments on direct appeal; and (5) the evidence against Stermer was legally insufficient.

The state habeas court appointed counsel for Stermer's post-conviction motion.  But this lawyer never supplemented the record or filed any additional papers with the court.

The state habeas court then denied Stermer's motion.  In support of this ruling, the court stated as follows:

> Pursuant to [Michigan Court Rule] 6.504(B) this Court examined the motion together with all files, records, transcripts, and correspondence, relating to the judgment under attack.  After review of the documentation, under MCR 6.504(B)(2) it plainly appears to this Court that the material reviewed along with the motions do not entitle Defendant to relief and therefore the Court is denying the motions without any further proceedings.
>
> . . . .
>
> As stated above, the Court found no reason to grant the Motion for Relief from Judgment and did not order an evidentiary hearing.  Pursuant to MCR 6.508(B) the Court determined that an evidentiary hearing was not required and chose to decide the motion after review of the documents filed herein.  The Court does not find any reason pursuant to MCR 6.508(D) which would entitle the Defendant to relief.

(Decision on Mot. for Relief, R. 29-3 at PageID #2813–14.)

Now with different counsel, Stermer sought leave to appeal this ruling.  But the Michigan Court of Appeals denied this request, saying she "fail[ed] to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (Ct. of Appeals Habeas Filings, R. 24-18 at PageID #2060.)  Stermer's application to the Michigan Supreme Court was similarly denied, using the same language about Michigan Court Rule 6.508(D).  *People v. Stermer*, 871 N.W.2d 172 (Mich. 2015) (mem.).

While this was going on, the district court issued an order to show cause why her federal habeas petition should not be dismissed, since it was unaware that Stermer had filed her motion for relief in state court.  Stermer responded through counsel and informed the district court of her state-court filings and progress.

### D.  Amended Habeas Petition

After the Michigan Supreme Court denied her petition, Stermer moved to reopen her federal habeas proceedings, and now, with counsel, sought leave to amend her petition.  Her amended petition raised essentially the same grounds for relief as her state habeas petition.  The district court granted Stermer's motion and ordered the state to respond.**[2]**

---

[2]In a footnote of its brief on appeal, the state also argues that AEDPA's statute of limitations bars the claims on which Stermer prevailed in the district court.  There are multiple problems with this argument.  First, as the state admits, its argument was forfeited.  *See Wood v. Milyard*, 566 U.S. 463, 470 (2012) (noting that statute-of-limitations defenses must be raised in the state's response to a habeas petition).  In its response to Stermer's amended petition, the state explicitly said it was "not arguing that any of Stermer's habeas claims are barred by the statute of limitations."  (Resp., R. 23 at PageID #327.)  In fact, the state's argument is double forfeited: not only did it fail to raise this in its initial responsive pleading, but it also raised this for the first time in a footnote on appeal.  *See, e.g.*, *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 614–15 (6th Cir. 2014) ("[A]n argument not raised before the district court is waived on appeal to this Court." (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008))).

While the state argues that under *Day v. McDonough*, 547 U.S. 198, 209–10 (2006), we can still raise the issue *sua sponte*, there are many reasons for us not to do so here.  This Court rarely will revive forfeited arguments, and even then will typically do so only when the "new issue is clear and beyond doubt" or when needed "to prevent manifest injustice."  *Hayward*, 759 F.3d at 615 (first quoting *Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 545 (6th Cir. 1996); and then quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 244 (6th Cir. 1991)).  Here, the issue is not clear-cut, since Stermer's initial petition at least alleged that the prosecution mischaracterized the evidence, meaning her prosecutorial misconduct claim could relate back to her original filing and thus would be timely.  *See Mayle v. Felix*, 545 U.S. 644, 654–55, 664 (2005).  And it is hard to see how considering the merits of Stermer's petition would result in a "manifest injustice."  *Hayward*, 759 F.3d at 615 (quoting *Taft*, 929 F.2d 244).

Perhaps most significantly, the state's affirmative disclaimer of any statute-of-limitations defense in its response is far closer to a deliberate waiver, which this Court cannot excuse.  *See Wood*, 566 U.S. at 467, 474 (finding waiver when the state said it was "not challenging, but do[es] not concede, the timeliness of the petition").

After briefing was completed on Stermer's petition, the district court ordered an evidentiary hearing on her claims that her attorneys rendered ineffective assistance and that the admission of the state's fire expert violated her right to due process. The state filed a motion for reconsideration, arguing that because the state habeas court had denied her claims on the merits, the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011), barred her from submitting additional evidence. The court deferred ruling on this motion until after the hearing, which was held on October 24 and 25, 2018.

At the hearing, several witnesses testified regarding the cause and origin of the fire. Scott Leroy, the state's original fire expert, remained consistent with his trial testimony. The state also retained an additional fire expert, who agreed with Leroy's methodology and said that it met industry standards.

Stermer called a fire expert, Robert J. Trenkle, to rebut the state's forensic evidence. *Id.* The district court described his testimony as follows:

> After reviewing Scott Leroy's preliminary examination testimony, trial testimony, and written report, Trenkle concluded that the evidence did not support Leroy's arson determination. Trenkle testified that the evidence Leroy relied upon was insufficient to allow for a determination as to the fire's cause. He also testified that, assuming the fire was intentionally set, it was more likely set by Mr. Stermer than by Petitioner.
>
> Trenkle pointed to a number of deficiencies in Leroy's methodology. First, Leroy incorrectly concluded that the fire's speed supported the theory that an accelerant was used. He explained that many other factors could have contributed to the fire's speed, including the exposed trusses, lack of drywall, and type of wood used in the home's construction. Second, the degree of damage to the home and the collapse of the first floor onto the basement floor rendered it impossible to eliminate every possible accidental cause, such as an electrical fire, a candle, or oil lamp. Third, Leroy failed to sample or move the debris in the basement, which was approximately two feet deep. Because the first floor fell into the basement, testing that debris would have been useful in a cause determination.
>
> Finally, Trenkle testified that an expert would have been helpful to the defense to, at a minimum, assist in the cross-examination of the prosecution's expert.

*Stermer v. Warren*, 360 F. Supp. 3d at 664.

---

In any event, given all these circumstances, there is no reason for us to forgive the state's failure to raise this defense below.

Both Stermer and her trial counsel, Jeffrey Getting, also testified.  Getting said he presented two alternative theories in Stermer's defense: that the fire was accidental, or that Todd had set the fire to obtain insurance proceeds, accidentally killing himself.  Getting thought he could rely on Leroy's testimony alone, even though it contradicted his theory that the fire was an accident, and did not show that Todd was more likely to have started the fire, assuming it was an arson.  "Despite his limited experience with arson prosecutions, he did not consult an expert to assist him in preparing to cross-examine Leroy." *Id.* at 665.  Stermer testified that she begged Getting to hire his own expert, but that this request went unheeded.

Following this hearing, the district court granted Stermer a conditional writ of habeas corpus. *Id.* at 645, 670.  Looking to the state habeas court's decision, the district court first had to decide whether it was a decision on the merits of Stermer's claims. *See id.* at 660–62.  This was critical because if the state court decided Stermer's case on the merits, (1) AEDPA's highly deferential standard of review is triggered, and (2) the federal habeas court is barred from considering new evidence. *Id.* at 652 (citing 28 U.S.C. § 2254(d); *Pinholster*, 563 U.S. at 181).  The district court found that the state habeas court's denial was likely based on Stermer's failure to raise her claims on direct appeal, meaning its decision was not based on the merits. *Id.* at 662.  Accordingly, *de novo* review applied and the court could consider the testimony presented at the evidentiary hearing. *Id.* at 653, 663.

Turning to Stermer's petition, the court found she was entitled to relief on her prosecutorial misconduct and ineffective assistance claims. *E.g.*, *id.* at 653.  In fact, predicting this appeal, the district court also determined she was entitled to relief even under AEDPA deference (in case *de novo* review did not apply). *Id.*

On the prosecutorial misconduct claim, the district court found that multiple comments by the prosecutor during his closing argument denied Stermer's right to a fair trial.  First, the court pointed to the prosecutor's statements regarding witness credibility, in which he repeatedly called Stermer a liar and bolstered the testimony of other witnesses. *Id.* at 654–55; *see also id.* at 655 (pointing to the prosecutor's statement that "I would suggest that we are dealing with a diabolical, scheming, manipulative liar and a murderer" (quoting Trial Tr. vol. 5, R. 24-11 at PageID #1724)).  Second, the district court found that the prosecutor misstated the facts and

presented facts not in evidence. *Id.* at 655–56. Specifically, the court highlighted the prosecutor's statement about Stermer's cell phones being in her vehicle and his claim that there was no evidence showing Todd's previous fires were arson. *Id.* The district court also found that the prosecutor had improperly injected race into the proceedings and created "the possibility of arousing prejudice in a predominantly white jurisdiction" by calling Chris Williams to testify regarding his affair with Stermer, in view of the fact that Williams is black and Stermer is white. *Id.* at 657.

Turning to the ineffective assistance claim, the district court first found that trial counsel's failure to object to the prosecutor's statements was unconstitutionally deficient. *Id.* at 659. And because the evidence against Stermer was not overwhelming, this failure could have affected the outcome of her trial. *Id.* at 659–60. The court also found that trial counsel was deficient in failing to consult with or call his own fire expert. *Id.* at 660. This is because the prosecution's case depended on its expert's conclusion that the fire was arson, and Stermer's lawyer failed to present any expert testimony either supporting his accidental-fire theory or alternatively showing that Todd was more likely to be the arsonist. *Id.* at 665–67. Similarly, Stermer's appellate counsel was ineffective for failing to raise these claims on direct review. *Id.* at 669–70.

Based on these claims, the district court granted Stermer's petition and ordered the state to either retry or release her. *Id.* at 670. The court also granted Stermer's motion for release on bond during further proceedings in her case. *Id.* The state appealed, arguing that the district court failed to properly apply AEDPA deference to the state habeas court's decision, which it says would require that her claims be rejected. That appeal is now before us.

## II. DISCUSSION

### A. Standard of Review

In a habeas appeal, we review questions of law *de novo*, including the ultimate decision to grant or deny the petition. *Satterlee v. Wolfenbarger*, 453 F.3d 362, 365 (6th Cir. 2006); *Northrop v. Trippett*, 265 F.3d 372, 376 (6th Cir. 2001). The district court's factual findings from an evidentiary hearing are reviewed only for clear error. *Satterlee*, 453 F.3d at 366. On the

other hand, factual findings based solely on the state court record are subject to *de novo* review. *Northrop*, 265 F.3d at 377.

Petitions for habeas corpus brought by state prisoners are subject to 28 U.S.C. § 2254, the modern version of which comes from the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See, e.g.*, *Northrop*, 265 F.3d at 376; *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999). AEDPA requires habeas petitioners to exhaust their claims in state court before turning to a federal court for relief. 28 U.S.C. § 2254(b)(1). And if a state court decides a claim on the merits, that decision is subject to significant deference. *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 101 (2011); *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 592–93 (6th Cir. 2012).

For a federal court to grant relief in such a case, the state court's decision must have been "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Under these rules, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). This deference applies even when the state court fails to explain its reasoning, in which case "the federal court 'must determine what arguments or theories . . . could have supported the state court's decision'" and afford those theories AEDPA deference. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (per curiam) (alteration in original) (quoting *Richter*, 562 U.S. at 102). Furthermore, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664.

Section 2254(d) also determines which facts a federal court can consider. When assessing whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), the reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits," *Pinholster*, 563 U.S. at 181. Because of this, a district court cannot use a federal evidentiary

hearing to supplement the record when assessing a claim under § 2254(d).  *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 465 (6th Cir. 2012).  That said, if a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits.  *See, e.g.*, *Brumfield v. Cain*, 135 S. Ct. 2269, 2276 (2015); *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007); *Fears v. Bagley*, 462 F. App'x 565, 574 (6th Cir. 2012); *see also, e.g.*, *Pinholster*, 563 U.S. at 205 (Breyer, J., concurring in part and dissenting in part) ("For example, if the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a [§ 2254](d) ground) [a federal habeas] hearing might be needed to determine whether the facts alleged were indeed true."); *cf., e.g.*, *Hurles v. Ryan*, 752 F.3d 768, 790–91 (9th Cir. 2014) ("[W]here a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process itself is deficient' and not entitled to deference."  (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *abrogated on other grounds by Pinholster*, 563 U.S. 170)); *Robinson v. Howes*, 663 F.3d 819, 823 n.2 (6th Cir. 2011) (noting that a decision would not be "on the merits" if the issue were decided without the key records establishing the basis for the claim).

If a habeas petitioner satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never "adjudicated on the merits" by a state court, 28 U.S.C. § 2254(d), AEDPA deference no longer applies.  Instead, the petitioner's claim is reviewed *de novo* as it would be on direct appeal.  *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).  The district court would also be free to expand the record, provided that the petitioner diligently attempted to present those facts in state court (or alternatively if she meets AEDPA's narrow exception for evidence of actual innocence).  *See, e.g.*, *Williams v. Taylor*, 529 U.S. 420, 431–32, 437 (2000); *Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013); *see also* 28 U.S.C. § 2254(e)(2); *Keeling*, 673 F.3d at 465.

**B. Is the State Habeas Decision Entitled to AEDPA Deference?**

In its opinion, the district court found that the state courts had never adjudicated Stermer's habeas claims on the merits. *Stermer v. Warren*, 360 F. Supp. 3d at 660–62. This finding was incorrect. While the state court never issued a reasoned opinion and cited a provision that could include a procedural bar, a review of the state court's order and the Supreme Court's guidance on this issue require a presumption that this was a decision on the merits. Accordingly, in reviewing Stermer's claims on appeal, we must apply AEDPA deference pursuant to 28 U.S.C. § 2254(d).

Under AEDPA, this Court must give significant deference to a state court's decision when it rejects a petitioner's claim "on the merits." 28 U.S.C. § 2254(d); *accord, e.g.*, *Jordan*, 675 F.3d at 592–93. But how do we know if a decision is "on the merits"? While this would be easy if the state habeas court provided a detailed, reasoned opinion, rarely are federal courts so lucky.

To address this dilemma, the Supreme Court created a presumption that § 2254(d) applies, even when there is no reasoned state court opinion. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99; *see also id.* at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). Thus, unless there is good reason for a federal court to think a state court's decision was *not* on the merits, the federal court must assume that it *was* on the merits and apply § 2254(d).

That said, "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99–100; *see also Johnson v. Williams*, 568 U.S. 289, 302 (2013) ("Thus, while the *Richter* presumption is a strong one that may be rebutted only in unusual circumstances, it is not irrebuttable."). For example, short denials without opinion are most commonly seen in state appellate courts. *See, e.g.*, *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("For instance, the decision may consist of a one-word

order, such as 'affirmed' or 'denied.'"). In such a case, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Id.*; *accord Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991).

Even when there is no earlier decision that the Court can "look through" to, it is still possible for the *Richter* presumption to fall. In assessing such a challenge to the presumption, this Court considers, among other things, "the language used by the state court in its discussion of the claim at issue and the context of that discussion when the state court's opinion is 'read as a whole.'" *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015) (per curiam) (quoting *McCarley v. Kelly*, 759 F.3d 535, 543–44 (6th Cir. 2014), *vacated on other grounds*, 135 S. Ct. 2887 (2015) (mem.)).

Both the Michigan Court of Appeals and the Michigan Supreme Court denied Stermer's claims without a reasoned opinion. Thus, we must "look through" to the state trial court's decision to determine whether these denials were on the merits. *Wilson*, 138 S. Ct. at 1192.

Two portions of the state trial court's habeas decision provide this sort of context. First, the court began by discussing its review of Stermer's motion and the record:

> Pursuant to [Michigan Court Rule] 6.504(B) this Court examined the motion together with all files, records, transcripts, and correspondence, relating to the judgment under attack. After review of the documentation, under MCR 6.504(B)(2) it plainly appears to this Court that the material reviewed along with the motions do not entitle Defendant to relief and therefore the Court is denying the motions without any further proceedings.

(Decision on Mot. for Relief, R. 29-3 at PageID #2813.)

Michigan Court Rule 6.504(B) essentially says exactly what the state court wrote here: the state habeas court must "promptly examine" the motion and related records, and then can summarily deny the motion if "it plainly appears from the face of [those] materials . . . that the defendant is not entitled to relief." As the district court said, this rule does not clearly suggest a procedural bar or a decision on the merits. *Stermer v. Warren*, 360 F. Supp. 3d at 661 (citing *Henderson v. Palmer*, 730 F.3d 554, 562 (6th Cir. 2013)). Thus, the *Richter* presumption remains in effect.

The second part of the state court's decision is more difficult.  There, the court said that it "[did] not find any reason pursuant to MCR 6.508(D) which would entitle the Defendant to relief."  (Decision on Mot. for Relief, R. 29-3 at PageID #2814.)

Michigan Court Rule 6.508(D) reads as follows:

**(D)** Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested.  The court may not grant relief to the defendant if the motion

> (1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on [direct] appeal . . . ;

> (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates [cause and prejudice] . . . .

In short, while the rule contains several procedural grounds for denying a petitioner's claim, it also notes that "[t]he defendant has the burden of establishing entitlement to the relief requested."

Interpreting this language, this Court previously found that "Rule 6.508(D) has both a procedural and a substantive component," meaning that a state court's "citations to a defendant's failure to meet the burden of establishing entitlement to relief can refer to a defendant's failure to meet that burden on the merits."  *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).  Thus, a citation to Rule 6.508(D) could be either substantive or procedural, meaning the *Richter* presumption applies but could still be rebutted.  *See, e.g.*, *Ivory v. Jackson*, 509 F.3d 284, 292–93 (6th Cir. 2007) (looking through a summary denial under Rule 6.508(D) to the state trial court's habeas decision, which expressly stated that the petitioner could have submitted his claims on direct appeal but failed to do so).

Neither Stermer nor the district court have shown any reason why the "strong" *Richter* presumption should be rebutted in this case. *Williams*, 568 U.S. at 302. As the district court correctly noted, neither Rule 6.508(D)(1) nor (D)(2) could apply to Stermer's petition, leaving Rule 6.508(D)(3) as the only possible non-merits ground for denial. And while the district court focused on the fact that Rule 6.508(D)(3) is "a firmly established and regularly followed procedural rule," *Stermer v. Warren* 360 F. Supp. 3d at 662 (citing *Luberda v. Trippett*, 211 F.3d 1004, 1008 (6th Cir. 2000)), this conflates the inquiry into whether a state rule qualifies as an "adequate and independent state procedural bar," *Luberda*, 211 F.3d at 1005; *cf., e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991) (discussing this doctrine), with whether the state court *actually applied* that rule.

A procedural rule's availability alone does not show it was more likely that the state relied on that rule instead of deciding the case on the merits. Such an assumption would flip *Richter*'s contrary prescription on its head, especially given that in the procedural default context, "neither the mere availability nor the potential, or even obvious, applicability of such a [procedural] rule is determinative." *Henderson*, 730 F.3d at 561 (alteration in original) (quoting *Skinner v. McLemore*, 425 F. App'x 491, 495 (6th Cir. 2011)).

Furthermore, as this Court noted in *Guilmette*, "Rule 6.508(D)(3) applies only to claims that could have been brought on direct appeal, and thus—by necessity—it does not apply to claims of ineffective assistance of *appellate* counsel." 624 F.3d at 291. Since Stermer's state habeas petition included an appellate ineffective assistance claim, the state court could not have disposed of it solely using the procedural components of Rule 6.508(D). Given this and the facts discussed above, there is no reason to disturb *Richter*'s presumption, and so the state court order in this case counts as a decision on the merits. Section 2254(d) applies.

## C. Prosecutorial Misconduct

Having determined the correct standard of review, the next question is whether Stermer's claims have merit even under AEDPA deference. While a far closer question than if *de novo* review applied, we nevertheless find that the state court unreasonably denied Stermer's claim. Under Supreme Court case law, the prosecutor's comments regarding Stermer's credibility were

improper, and their frequency, their context, and the weight of the evidence against Stermer all show she was denied a fair trial. Accordingly, Stermer is entitled to habeas relief.

### 1. Legal Standard for Prosecutorial Misconduct

#### a. *Supreme Court Cases*

In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Supreme Court outlined the standard used to assess a claim of prosecutorial misconduct in a petition for habeas corpus. This framework provides the "clearly established Federal law" used to assess a state court's decision under 28 U.S.C. § 2254(d). *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam). Under *Darden*, the first question of course is whether the prosecutor's comments were improper. *See Darden*, 477 U.S. at 180 (noting that the prosecutor's comments in closing argument "undoubtedly were improper").

In other cases, the Supreme Court has discussed whether certain types of statements by prosecutors are improper within the prosecutorial misconduct framework. Relevant here, prosecutors cannot inject their personal opinions into the case, particularly as to what the evidence shows and as to the credibility of witnesses. *United States v. Young*, 470 U.S. 1, 7–8, 17 (1985).

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Id.* at 18–19; *see also Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005) (describing *Young* as providing that "[i]t is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying").[3]

---

[3]Although a deviation from *Hodge* (on which the district court substantially relied) cannot itself form the basis for habeas relief, since it is not clearly established Supreme Court case law, *e.g.*, *Ross v. Pineda*, 549 F. App'x 444, 449 (6th Cir. 2013), our citations to *Hodge* and other Sixth Circuit cases are only for their helpful discussion of

"Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also id.* ("[W]hile [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones.").

The requirement that a prosecutor's arguments be rooted in the evidence also means that the evidence must be accurately described. "Misrepresenting facts in evidence can amount to substantial error because doing so 'may profoundly impress a jury and may have a significant impact on the jury's deliberations.'" *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). "For similar reasons, asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way." *Id.* (citing *Berger*, 295 U.S. at 84).

But in assessing whether a defendant's due process rights were violated, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983), *aff'd in part*, 725 F.2d 1526 (11th Cir. 1984) (en banc), *vacated*, 469 U.S. 1202 (1985) (mem.)). If a prosecutor's comments were improper, the question becomes whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Donnelly*, 416 U.S. at 643); *accord, e.g.*, *Bates v. Bell*, 402 F.3d 635, 640–41 (6th Cir. 2005).

To decide this question, "the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12. Though not an exhaustive list, the Supreme Court has discussed several factors to consider in making this assessment. For example, *Darden* mentioned the weight of the evidence against the defendant, the tactical context of the prosecutor's statements, and whether the comments were invited by the defense's own conduct. 477 U.S. at 181–83; *accord Young*, 470 U.S. at 12–13, 19–20. The nature and frequency of the improper remarks can also determine whether the defendant's trial was rendered

Supreme Court precedent (which can provide the basis for habeas relief under AEDPA), *see Wiggins v. Smith*, 539 U.S. 510, 522 (2003).

unfair.  *See Berger*, 295 U.S. at 89 ("[W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential.").  Again, these are just some of the factors the Supreme Court has considered, and *Darden* provides a "highly generalized standard for evaluating claims of prosecutorial misconduct." *Matthews*, 567 U.S. at 49.

Many decisions of this Court have relied on *Darden*'s breadth in denying habeas relief.  As the Supreme Court has noted, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664.  Some panels have gone so far as to say that under AEDPA, a federal court "cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites . . . other Supreme Court precedent [meaning other than *Darden*] that shows the state court's determination in a particular factual context was unreasonable." *Stewart v. Trierweiler*, 867 F.3d 633, 639 (6th Cir. 2017) (first alteration in original) (quoting *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015)).  That said, cases like *Young* and *Berger* can provide this additional context, or else this circuit's precedent would mean a habeas petitioner essentially could never prevail on a prosecutorial misconduct claim.  *See, e.g.*, *id.* (using *Young* to assess a prosecutor's statements in closing argument); *Cauthern v. Colson*, 736 F.3d 465, 475–78 (6th Cir. 2013) (finding prosecutorial misconduct under *Darden* and *Young*); *cf., e.g.*, *Richardson v. Palmer*, 941 F.3d 838, 848 (6th Cir. 2019) (assessing a prosecutorial misconduct habeas claim under *Darden*).

### b.  The Sixth Circuit Framework

In reviewing prosecutorial misconduct cases on direct appeal, or on habeas claims where AEDPA deference does not apply, this Court has fleshed out the *Darden* standard by formalizing a two-step framework for assessing prosecutorial misconduct.  *See, e.g.*, *Bates*, 402 F.3d at 641; *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002); *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).  Under this framework, the reviewing court first determines (much like in *Darden*) whether the prosecutor's conduct or statements were improper.  *Macias*, 291 F.3d at 452.  Then, the court assesses whether this conduct was "flagrant," in which case it would violate the defendant's due process rights.  *Id.*; *see also, e.g.*, *United States v. Carroll*, 26 F.3d 1380,

1385 (6th Cir. 1994) (listing four factors used to decide whether prosecutorial misconduct was flagrant).

The district court in this case looked beyond Supreme Court case law and applied the Sixth Circuit's two-part framework. *Stermer v. Warren*, 360 F. Supp. 3d at 653–54. As the state argues on appeal, this was error. In *Parker v. Matthews*, the Supreme Court expressly held that the Sixth Circuit's two-step "improper and flagrant" inquiry could not be used in cases where AEDPA deference applies. 567 U.S. at 48–49. This is because "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." *Id.* (citation omitted) (quoting 28 U.S.C. § 2254(d)(1)).[4]

The question under AEDPA is not whether the state court followed Sixth Circuit case law, but whether it reasonably applied binding Supreme Court precedent. *Id.*; *Renico v. Lett*, 559 U.S. 766, 778–79 (2010). By assessing Stermer's claim in the context of the Sixth Circuit's framework, the district court applied the wrong test in this case. But in any event, this Court reviews the district court's grant of habeas relief *de novo*. *Satterlee*, 453 F.3d at 365. Thus, we proceed to assess Stermer's claim by applying AEDPA deference and looking only to whether the state court's decision comports with Supreme Court case law on prosecutorial misconduct.[5]

### 2. Application to Stermer's Case

#### a. *Were the Prosecutor's Statements Improper?*

Before addressing whether the prosecutor's statements in this case deprived Stermer of a fair trial, the state challenges the district court's finding that his comments were improper in the

---

[4]This does not mean that precedents from this Court are not instructive, provided they are answering the right question: whether a state court decision reasonably applied existing Supreme Court case law. Thus, published AEDPA decisions of this Court—provided they were not themselves abrogated for committing the error identified in *Matthews*—are binding on future panels and on the district courts within this circuit. *See Ross*, 549 F. App'x at 448–49 (discussing the effect of *Matthews* on Sixth Circuit precedent).

[5]While *Parker v. Matthews* noted that the Sixth Circuit's two-step framework does not constitute clearly established Supreme Court case law, and so cannot support habeas relief where AEDPA deference applies, 567 U.S. at 48–49, it did not overrule that framework or otherwise question its applicability to criminal cases on direct appeal or habeas cases where AEDPA deference does not apply.

first place.  Applying AEDPA deference and cases like *Young*, 470 U.S. at 7–8, 17–19, the question here is whether the state court could reasonably have found that the prosecutor's statements were arguments based on the evidence, as opposed to injections of personal opinion or misstatements of the facts presented at trial.  Because the record shows that the prosecutor's statements were not driven by the evidence, and instead instructed the jury on how they should view the evidence (namely, by assuming that Stermer was a liar), the state habeas court could not reasonably have found them to be proper.

The state argues that the prosecutor's comments about Stermer's credibility were acceptable "because the prosecutor never suggested that this argument was based on his personal knowledge or opinion—rather, it was based on the evidence, and specifically the testimony that Stermer had made inconsistent statements about the fire to people after the fact."  (Resp't's Br. at 31); *see also, e.g.*, *West v. Bell*, 550 F.3d 542, 565–66 (6th Cir. 2008) ("This Court has held that a prosecutor may assert that a defendant is lying during her closing argument when emphasizing discrepancies between the evidence and that defendant's testimony.  To avoid impropriety, however, such comments must reflect reasonable inferences from the evidence adduced at trial.  Again, misconduct occurs when a jury could reasonably believe that the prosecutor was, instead, expressing a personal opinion as to the witness's credibility."  (quoting *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 2008))); *Cristini v. McKee*, 526 F.3d 888, 902 (6th Cir. 2008) (same).**6**  But a look to the prosecutor's arguments shows this was not the case: while the state says the prosecutor's statements were rooted in the evidence, in reality they were predominantly based on the prosecutor's own assessment that Stermer's version of events was not credible.  This runs directly afoul of *Young* and the Supreme Court's other cases on prosecutorial misconduct.  *Young*, 470 U.S. at 7–8; *see also Darden*, 477 U.S. at 179–180; *Berger*, 295 U.S. at 88.

Importantly, the prosecutor began his discussion of Stermer's statements with his lengthy "she's a liar" speech, in which he repeatedly said "[t]here is no question but that [Stermer is] a

---

**6**While these cases use the Sixth Circuit's own prosecutorial misconduct framework, which is unavailable within AEDPA deference, we mention them because the state uses them to show the limits of the *Darden* framework in arguing that a prosecutor can say a defendant is lying if that claim is rooted in the evidence.

liar and will lie when it suits her." (Trial Tr. vol. 5, R. 24-11 at PageID #1704.) The question is whether this statement was a preview of his argument from the evidence (in which case it might be proper, or at least not clearly improper under AEDPA deference), or whether it expressed the prosecutor's own opinion about how the jury should view Stermer's story. The arguments immediately following the "liar" speech help answer this question.

First, the prosecutor discusses Stermer's claim that Todd said "nobody else would ever have [her]" on the day of the fire. (Trial Tr. vol. 5, R. 24-11 at PageID #1705–07.) He begins by hypothesizing that Stermer probably discussed this statement with her attorney before telling it to the investigator. He then goes on to suggest that because Stermer claimed Todd said "nobody's going to have you" as the fire was raging, her statement was ridiculous and the insurance investigator pointed out that it was ridiculous. (*Id.* at #1706–07.)[7] The trouble is that the insurance investigator's statement was about something completely different (*see id.* at #1711 (discussing Stermer's actions through the day and saying "[t]his does not sound like a couple that's separating to me")), leaving only the prosecutor's own view that the statement was ridiculous as his reason that it had to be a lie.

Second, the prosecutor referred to the gas station testimony, and noted that Cindy DeLoach "certainly appears to be a very credible person who has recall of the incident, has no reason to make anything up." (*Id.* at #1708.) This statement itself toes the line of impermissible bolstering, with the prosecutor opining that DeLoach "certainly appears to be a very credible person," especially since the context compares DeLoach to Stermer, whom the prosecutor calls a known liar. (*Id.* at #1704, #1708); *see also, e.g.*, *Young*, 470 U.S. at 18 (noting that "[t]he

---

[7]As a further point, this claim itself cannot fairly be drawn from Stermer's statements. Throughout the transcript, Stermer distinguished between the "yelling" she claims Todd was directing toward her before the fire and the "screaming" he did after the fire started. (*E.g.*, Trial Tr. vol. 2, R. 24-8 at PageID #1085.) The question the prosecutor quotes itself makes this distinction and shows that Stermer was saying this yelling occurred before the fire and before Todd's reaction to it. (*See* Trial Tr. vol. 5, R. 24-11 at PageID #1706 ("The question is: 'Now, you said you could hear him yelling and then it turned to screaming. What was he yelling at that point? Was he just—' Answer. . . .'That's when he was yelling that nobody else would ever— . . . .'").)

Furthermore, the prosecutor mischaracterized Stermer's responsiveness to the insurance investigator. Examining a portion of her interview with the investigator, the prosecutor stated that Stermer was "not even responsive to the darn question" when she was asked, "Could you understand anything that [Todd] was saying?" (*Id.* at #1706–07.) In fact, Stermer did respond, saying: "He told me nobody else would ever have me." (*Id.* at #1707.)

prosecutor's vouching for the credibility of witnesses" is improper).  But in any event, all this leaves is Stermer's denial of pumping gas into a canister and DeLoach's unclear testimony about the back window of Stermer's truck.  In this context, the prosecutor isn't using Stermer's statement to demonstrate her untruthfulness in support of his earlier claim that she is a liar.  Rather, he is saying that Stermer's explanation here should not be believed *because* she's a liar.

Similarly, the prosecutor argued it was "somewhat inconsistent" that when Stermer was interviewed by police immediately after the fire, she did not mention getting gas earlier that morning, but then admitted this to the fire investigator two days later.  The prosecutor then asked the jury to extrapolate from this fact, and from the fact that she consulted with an attorney before talking to the insurance investigator, that Stermer changed her story as part of an effort to cover up her involvement in the murder.  But once again, this theory is based on the prosecutor's own speculation.  Whatever inconsistency can be found between her failure to bring up the gas station trip on the day of the fire but mentioning it to another investigator two days later is not evidence that could support the prosecutor's claim that Stermer is a known liar (and therefore guilty of murder).

Third, the prosecutor focuses on Stermer's suggestion—based on her claim that Todd said "nobody else will ever have you"—that the fire might have been a failed murder-suicide. (Trial Tr. vol. 5, R. 24-11 at PageID #1708.)  Insofar as Stermer suggested a murder-suicide attempt (which itself is somewhat unclear from the record), it was in response to a request for speculation by the insurance investigator.  It seems farfetched to use this to conclude that Stermer was lying when it is unclear whether she intended to place any weight behind this statement (and especially where the defense did not rely on this theory at trial).  The prosecutor then went on to tear down "Stermer's" theory by noting how illogical it would be for Todd to attempt a murder-suicide in this manner.  (*See, e.g.*, *id.* at #1708–09 ("If you are going to commit a murder/suicide, . . . you do the murder part first, you don't do the suicide first because then you aren't going to be able to do the murder.  I think everybody, including Todd Stermer, understood that."); *id.* at #1709 ("If you are going to commit suicide or even a murder/suicide, wouldn't a gun make more sense?"); *id.* ("Arson is something that you do to cover things up, not necessarily a means of a homicide.  It's to cover up a homicide . . . .").)  But in no way does this demonstrate

through reference to the evidence that Stermer's statement about Todd's yelling was a lie. The prosecutor's remaining statements about Stermer's truthfulness are similarly based on speculation and his own opinion.**[8]**

The one concrete example where the prosecutor could have argued from the evidence that Stermer was lying is where she denied having an affair when asked by the insurance investigator. Two points on this. First, it seems obvious that someone might lie about having an affair while telling the truth about other matters. Second, the prosecutor did not actually argue that Stermer's lies about the affair permit an inference that she was lying about everything else (likely because of the obviousness of the first point). If the prosecutor had constrained his comments to this asserted lie, the jury could have assessed this and considered its impact on the trustworthiness of Stermer's other statements. But instead, he made a broadside attack on Stermer's truthfulness without any real effort to tie it to the evidence.

The broader context of these comments is critical. *See Darden*, 477 U.S. at 179 (noting that prosecutorial misconduct must be assessed by placing the challenged remarks in context). In this case, Stermer did not testify at trial. Instead, the *prosecution* introduced the transcripts of her interviews. Thus, the prosecutor's statements that Stermer was a liar were not an earnest attempt to dispel her credibility and resolve some inconsistency between her trial testimony and that of another witness.

Nor was the prosecutor truly pointing to inconsistencies and arguing that the explanation was Stermer covering up her role in the murder. Looking to the context of his statements, the prosecutor did not present Stermer's interview and then argue from it that Stermer was lying. Instead he said first, "I'm going to be talking about statements that Linda Stermer made," but

---

**[8]**For example, the prosecutor points to discrepancies regarding which door Stermer used to exit the house, but (1) the statements in question are highly ambiguous, making it a leap to infer from them that Stermer was lying, and (2) as the prosecutor himself said, insofar as there even was a meaningful difference, it could easily be explained by reasons other than a scheme to cover up a murder. (*See* Trial Tr. vol. 5, R. 24-11 at PageID #1712–13 ("[M]aybe there are parts of this that we just don't know. Okay. And maybe that's the reason for her inconsistencies. . . . I don't know that it's so much important as to whether she went out the bottom, whether she went out the top, and certainly it could be argued that someone that wasn't committing murder could be under the stress of the situation and they just don't remember . . . .").) Similarly, the prosecutor claimed that there was no physical evidence supporting her story about the vehicle getting stuck in the mud during her attempt to leave the house, but a lack of corroborating evidence does not amount to proof that her story was a lie, and therefore cannot support the prosecutor's inference that Stermer was a known liar.

that he wanted to "caution" the jury before doing so that "we know she is a liar." (Trial Tr. vol. 5, R. 24-11 at PageID #1704; *see also id.* ("There is no question but that she's a liar and will lie when it suits her, okay.").) He went on to say, "what I want you folks not to do is to adopt [Stermer's interview statements] as fact because if you do, they are going to be very difficult to reconcile maybe with other parts of it. So as you're looking at the evidence, keep in mind anything she says is suspect. She's a liar." (*Id.*) So even before discussing her statements, the prosecutor told the jury that Stermer was a liar and should not be believed.

The prosecutor's conclusion further supports this view of his statements. He asks the jury, "Is there anything that we've heard other than from a liar, and even then not a real good story, that would lead us to believe that . . . Todd Stermer caused this?" (*Id.* at #1724.) While the state argues that the reason the prosecutor told the jury Stermer's story was to prove she was a liar, this formulation shows that the opposite is true: the prosecutor's view that Stermer is a liar was presented independently from the weakness of her story, and then her story was described as a lie to undercut the defense's theory of the case.

Viewed as a whole, the prosecutor's discussion of Stermer's statements was a strawman presentation of her theory of what happened, done in the course of arguing why her theory was wrong and why the prosecution's theory was right.[9] In undercutting this presentation before it began, the prosecutor argued that "we know [Stermer] is a liar" at the outset (*id.* at #1704), and then failed to support this claim by reference to lies in the evidence. He then ended his argument by calling Stermer "a diabolical, scheming, manipulative liar and a murderer." (*Id.* at #1724.) The view that the prosecutor's statements were driven by the evidence is not reasonably supported by the record, and finding otherwise would be an unreasonable application of *Darden*, *Young*, and *Berger*.[10]

---

[9]This is reflected in part by the prosecutor's reference to her statement two days after the fire when the insurance investigator asks her if she has "an opinion, a theory about what happened." (Trial Tr. vol. 5, R. 24-11 at PageID #1705, #1708–10.) The prosecutor then argues that this theory is inconsistent with the other evidence presented in the case or with his own views of arson as "something that you do to cover things up." (*Id.* at #1709.) In effect, the prosecutor conflates Stermer's answer to a request for speculation two days after the fire with the defense's theory of the case two years later at trial, building up a strawman defense only to tear it down.

[10]The dissent cites *Parker v. Matthews* for the proposition that the statements in this case cannot support a finding of prosecutorial misconduct. But *Matthews* said nothing of the sort, and the statements at issue in *Matthews*

The district court also points to the prosecutor's statements about whether Stermer had a cell phone in her vehicle and whether Todd's previous two fires were arson, suggesting that both were misstatements of the evidence and therefore prosecutorial misconduct. *Stermer v. Warren*, 360 F. Supp. 3d at 655–56. For the reasons that follow, both of these statements were improper remarks.

The first statement at issue is the prosecutor's argument about the location of Stermer's phones: "Unfortunately, the lady who has two cell phones has neither one of them with her to call for help. The phones are in the van according to go her [sic]. Possible? Yes. Convenient? Very." (Trial Tr. vol. 5, R. 24-11 at PageID #1714.) The district court construed this comment to mean that Stermer had her cell phone in the van but chose not to call for help after she fled the house from the fire, thus implying her guilt. *See Stermer v. Warren*, 360 F. Supp. 3d at 655–56 ("The prosecutor created this significant detail out of thin air to make the argument that Petitioner consciously chose not to call for help."). And since "the State failed to present *any* evidence at trial that there was a cell phone in the van when Petitioner fled the house," *id.* at 656, the prosecutor's remark was a misstatement of the evidence.

On appeal, the state says that the prosecutor wasn't arguing that Stermer should have called from the van, but rather that she claimed the phones were in the van as a convenient excuse for not calling for help from the house. As a preliminary note, while the state faults the district court for "[misunderstanding] the import of this line of reasoning" (Resp't's Br. at 37), this misunderstanding is excusable, as the state never made this argument in its response below, *see, e.g.*, *Scottsdale Ins. Co.*, 513 F.3d at 552 (noting that arguments not raised before the district court are forfeited on appeal). But even accepting the state's interpretation, the prosecutor's statement would still be improper. This is because the prosecutor did not just misstate whether the phones were or were not in the van, but rather incorrectly described Stermer's own

---

were (1) not at all like those here and (2) mitigated by other statements the prosecutor made during his closing. 567 U.S. at 45–47. And while the dissent also asserts that the prosecutor's statements about Stermer's propensity to lie were "record supported" (Dissent at 50), our discussion in the preceding pages should dispel any such notion.

statements.  The state has not pointed to any testimony where Stermer says her phones were in the van, nor did we find any through our own review of the record.**11**

The broader context shows that the prosecutor used this comment about what Stermer said regarding the location of her cell phones not just to show she declined to call for help, but also in support of his argument that Stermer was a liar.  (*See* Trial Tr. vol. 5, R. 24-11 at PageID #1714–15 ("And the point being is these things add up, these little inconsistencies, these little inconvenien[t] truths, these little circumstances, they add up to strong circumstantial evidence.").)  While it is bad enough to misstate the record, it is even worse to do so in the course of undercutting other evidence presented to the jury.

Turning to the second statement, on rebuttal, the prosecutor discussed Todd Stermer's two prior fires but said that "even by [Linda Stermer's] own version it's not an arson, nor was the first one.  There is no evidence of that either."  (Trial Tr. vol. 5, R. 24-11 at PageID #1764–65.)  He concluded by saying "there is no evidence that it was arson, so it's nonsense."  (*Id.* at #1765.)

In defending this statement, the state largely focuses on the second portion, in which the prosecutor said there was no evidence of arson.  The district court said this was wrong because a police report in the state's possession quoted another officer as saying one of Todd's previous house fires "was definitely an arson." *Stermer v. Warren*, 360 F. Supp. 3d at 656 (quoting Police Report, R. 20-13 at PageID #312).  But this police report was not placed into evidence, the statement was hearsay, and it lacks any further explanation or support.  While a prosecutor cannot misrepresent the facts in evidence, *Donnelly*, 416 U.S. at 646, neither Stermer nor the district court present a Supreme Court case that stands for the proposition they argue here:  that a prosecutor with knowledge that someone suspected a fact is true cannot argue in court, based on the evidence presented, that there is no evidence of that fact.

---

**11**In fact, Stermer told investigators that her cell phone was "in the bedroom" and her purse was "in the van."  (Statement of Linda Stermer, R. 24-19 at PageID #2345.)  The State's own witness, Kate Fox, testified that Stermer had a "secret" cell phone, but that she kept it in the "Blazer" (Trial Tr. vol. 4, R. 24-10 at Page ID #1541–42)—the vehicle that Stermer's children had taken from the house before the fire began—meaning she would not have had access to it during the incident.

The first part of the prosecutor's statement is more concerning.  There, he said that "even by [Stermer's] own version," the previous house fires were not arsons.  (Trial Tr. vol. 5, R. 24-11 at PageID #1764.)  But nowhere in the state's response below or in its briefing here does it point to any statement by Stermer that supports this claim, nor could we find one ourselves.  And so, this is another example of the prosecutor misstating Stermer's testimony to undercut the defense theory of the case.  Such misstatements of the evidence are clearly improper under Supreme Court case law.**[12]**

### b.  Did the Prosecutor's Statements Deprive Stermer of a Fair Trial?

For the reasons discussed above, the prosecutor's statements were improper.  But before granting habeas relief, we must also find that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).  Furthermore, because AEDPA deference applies, we must find that no fair-minded jurist could disagree with this assessment. *Richter*, 562 U.S. at 101.

Even under the forgiving standard of *Darden* coupled with AEDPA deference, it was unreasonable for the state court to conclude that the fairness of Stermer's trial was not irreparably harmed by the prosecutor's closing.  The state's case was relatively weak, the prosecutor relied heavily on Stermer's statements in his closing arguments, and he repeatedly called her a liar while misstating her own testimony.  All these factors combine to show that Stermer was clearly denied due process.

---

**[12]**The district court also pointed to the prosecutor's decision to have Chris Williams testify as further evidence of misconduct. *Stermer v. Warren*, 360 F. Supp. 3d at 657. No matter what else occurred, it is worth clarifying that this decision, without further evidence as to the prosecutor's motives, was not misconduct. Williams's testimony was important to the prosecution's theory of motive: the fact that Stermer was having an affair undoubtedly lends credence to the testimony that Todd discovered the affair and asked for a divorce the night before his death. At no point during the prosecutor's questioning of Williams did he bring up race or the interracial nature of Williams's relationship with Stermer, making this a far cry from the cases relied on by the district court, *see, e.g.*, *United States v. Grey*, 422 F.2d 1043, 1044–46 (6th Cir. 1970) (finding prosecutorial misconduct on direct appeal when the prosecutor asked a character witness if he knew that the black, married defendant was "running around with a white go-go dancer"). And while there is always the risk that a racist juror could disregard her oath or that unconscious bias could affect the proceedings, the prosecutor was not "[a]ppeal[ing] to racial prejudice" simply by calling a black man—the most direct witness on the matter—to testify. *Stermer v. Warren*, 360 F. Supp. 3d at 657 (quoting *Grey*, 422 F.2d at 1046).

Turning first to the strength of the prosecution's case, the closing itself demonstrates the importance of the prosecutor's comments and his teardown of Stermer's explanations.  Almost half of the prosecution's closing argument was devoted to Stermer's statements to investigators, making it clear that this was a core element of its case.  On the other hand, the prosecution's in-person witnesses had significant weaknesses, such as the gas station attendant (who did not actually see a container or whether Stermer was pumping gas into anything but her vehicle), Kate Fox (whose own brother called her a liar and who had been charged with assaulting Stermer), and the jailhouse informants (whose credibility was severely undermined in cross-examination).  Further, the state's expert could not conclude who started the fire.  The prosecutor's closing was filled with speculation, asking the jury to imagine potential facts in support of the state's theory. (*See, e.g.*, Trial Tr. vol. 5, R. 24-11 at PageID #1701 ("We know that she purchased gas in the morning.  We know that she purchased three food items, one non-foods item.  We have no idea what those were and I'm not suggesting there is any evidence of that, but the nontaxable item, Bic lighter perhaps?  I don't know.").)   Given this, the closing argument shows that the prosecution was strongly relying on Stermer lying during her post-fire statements to suggest that she committed the murder.

The dissent takes issue with this point and tries to reframe these facts as an open-and-shut case.  For example, the dissent speculates that when driving her vehicle away from the house, Stermer must have seen her neighbors coming to help and then attempted to flee from them in her van, thereby demonstrating her guilt with respect to the fire.  This is one example of a pattern seen throughout the dissent, in which the prosecutor's version of how Todd's death might have occurred is presented as a fact beyond all plausible dispute.

Could a juror have guessed that this is what happened?  Perhaps.  But by conjuring up one possible conclusion and assuming it to be the truth, the dissent misunderstands our inquiry in this case.  In a prosecutorial misconduct case, the point of the Supreme Court's strength-of-the-evidence question is not to determine whether any reasonable juror could have voted to convict. Rather, when the evidence is relatively weak—particularly where it requires leaps like those taken by the dissent—the odds that a constitutional error might have affected the outcome become intolerably high.

This is not to suggest that the prosecution put on an impossibly weak case. Other circumstantial evidence—while possibly explained by Stermer—does point toward her guilt. (*See, e.g.*, *id.* at #1700–01 (noting that Stermer bought gas the morning of the fire and told her children to leave the house).) But given the relative weakness of this evidence, the fairness of her trial was irreparably undercut by the prosecutor's closing, in which he repeatedly opined that Stermer was untruthful and called her "a diabolical, scheming, manipulative liar." (*Id.* at #1724.)

Similarly, the length and repetition of the offending comments also show that Stermer was denied a fair trial. *See Berger*, 295 U.S. at 89 (noting that "pronounced and persistent" remarks can render a trial unfair). The prosecutor's inappropriate comments pervaded his closing argument. He began his discussion of Stermer's out-of-court statements with a lengthy speech calling her a liar, repeated his claim that she was a liar throughout his closing argument, concluded his principal argument by calling her "a diabolical, scheming, manipulative liar," and then reiterated that she was a liar at the end of his rebuttal. (Trial Tr. vol. 5, R. 24-11 at PageID #1724.) Viewing the record as a whole, it would be unreasonable to conclude that these statements did not "so infect[] the trial with unfairness" as to violate Stermer's right to due process. *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).

The state points to *Darden* as an example where worse conduct still resulted in the denial of a habeas petition. But while the words used by the prosecutor in *Darden* might seem worse in the abstract, *see, e.g.*, 477 U.S. at 180 n.12 ("[The defendant] shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash."), the *Darden* Court outlined several reasons why those statements did not make the defendant's trial fundamentally unfair. These reasons suggest the opposite result in this case.

In *Darden*, the Court specifically noted that "[t]he prosecutors' argument did not manipulate or misstate the evidence," that "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense," and that there was overwhelming evidence against the defendant. *Id.* at 181–82. The Court also noted that defense counsel had benefited from these statements by responding to them in a rebuttal, "turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and

actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner." *Id.* at 182.

On each of these points, the reverse is true here. As noted above, the prosecutor presented a strawman version of Stermer's defense, cherrypicked certain statements from the interview transcript, and even flat-out misstated her testimony, and then labeled Stermer a liar. These arguments were not invited by the defense's own presentation, the prosecutor had the last word, and the defense did not meaningfully respond to these claims during its own closing. And most importantly, as discussed above, the evidence against Stermer is not overwhelming. Given all this, any fair reading of *Darden* shows that Stermer was denied a fair trial.

Finally, although the state cites *Darden* in arguing that the trial court's preliminary instruction—"remarks by attorneys are not evidence"—cured any ills in this case (Resp't's Br. at 30 (quoting Trial. Tr. vol. 1, R. 24-7 at PageID #792–93)), this generic instruction cannot overcome the weight of the prosecutor's comments. While *Darden* noted that "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence," 477 U.S. at 182, *Donnelly*—upon which *Darden* relied—demonstrates that this principle has limits. There, the trial court "directed the jury's attention to the [specifically challenged] remark . . . , declared it to be unsupported, and admonished the jury to ignore it." *Donnelly*, 416 U.S. at 644.[13] While the court found that, in light of the broader context of the comment, this instruction could help mitigate any harm, it said that even considering the specific nature of the instruction, "some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect." *Id.* The completely generic instruction here, given before the start of trial, does not approach sufficiency under *Donnelly* and *Darden*.

At end, while this question of prejudice may be a difficult one, it is difficult only in the sense that it is near the line of whether any fair-minded jurist could conclude Stermer's trial was

---

[13]In the dissent's recitation of *Donnelly*'s facts, it conveniently omits this curative instruction, making it seem as though these comments were acceptable even in the absence of any effort by the trial judge to limit their effect. But the Court in *Donnelly* expressly relied on both the ambiguous nature of the prosecution's comments and on the "specific disapproving instructions" of the trial judge, 416 U.S. at 645, both of which were absent from this case.

fair, as opposed to none being able to. *See Richter*, 562 U.S. at 101. Because the facts push this case past the line of reasonable dispute, we must affirm the district court's grant of a conditional writ.

### D. Ineffective Assistance of Counsel

The district court also granted Stermer's habeas petition based on two claims of ineffective assistance of counsel. First, Stermer's counsel failed to object to the prosecutor's statements at closing argument. This significantly undercut Stermer's defense and could not have been part of a reasonable trial strategy, and so we affirm the district court's grant of Stermer's petition on this ground. Second, despite arguing to the jury that the fire may have been an accident, Stermer's lawyer never consulted with a fire expert to rebut the state's expert testimony. Due to procedural complications in Stermer's state habeas proceeding, we decline to rule upon the ultimate merits of this claim. But absent those procedural issues, the record suggests that Stermer's counsel was ineffective for failing to call such an expert, and this failure had a meaningful chance of affecting the outcome of Stermer's trial.

### 1. Legal Standard

The well-established federal law used for assessing Stermer's ineffective assistance claims is the framework from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* imposes a two-part test for determining whether counsel was unconstitutionally ineffective. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). The first prong assesses counsel's performance. Under this prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. In other words, a court assessing an ineffective assistance claim must "determine whether, in light of all the circumstances, the [challenged] acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. When making this assessment, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Second, in order to amount to a constitutional violation, the error by counsel must have been prejudicial to the defendant. *Id.* at 691–92. To prove prejudice, "[t]he defendant must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111–12.

Because the *Strickland* standard is general in nature, significant deference applies to state court decisions when assessing them under § 2254(d). *Richter*, 562 U.S. at 105. On the cause prong in particular, the Supreme Court has described this review as "doubly deferential," because AEDPA provides deference to the state court, which in turn is expected to give considerable deference to trial counsel's decisions. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quoting *Pinholster*, 563 U.S. at 190 (majority opinion)).

### 2.  Failure to Object During Closing Arguments

The first source of ineffective assistance identified by the district court is trial counsel's failure to object to the prosecutor's statements during closing arguments. *Stermer v. Warren*, 360 F. Supp. 3d at 659–60; *see also supra* Part II.C (discussing the prosecutor's statements and assessing them for misconduct). The failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel under *Strickland. See, e.g.*, *Hodge*, 426 F.3d at 375–76. This is because "when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant." *Id.* at 377.[14]

The state all but concedes that if Stermer wins on her prosecutorial misconduct claim, she also wins on her ineffective assistance claim. (*See* Resp't's Br. at 54–56 ("This claim essentially merges with the prosecutorial misconduct claim.").) But even if the state did not concede the point, an independent analysis also supports habeas relief on this claim.

---

[14]Again, while *Hodge* is not itself "well-established federal law," its application of *Strickland* on habeas review was not disrupted by *Parker*, 567 U.S. 37, and is still binding precedent in this circuit, *see Wiggins*, 539 U.S. at 522 (noting that cases assessing a habeas petition under AEDPA can be cited to support the court's application of prior, well-established Supreme Court precedent).

Turning first to performance, there is no way that the attorney's failure to object "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The state habeas court's presumed finding to the contrary was unreasonable.

In this case, trial counsel stood by while the prosecutor repeatedly branded Stermer a liar, misrepresented her statements, bolstered the credibility of other witnesses, and called her a "diabolical, scheming, manipulative liar and a murderer." (Trial Tr. vol. 5, R. 24-11 at PageID #1724.) While "any single failure to object usually cannot be said to have been error," here defense counsel "so consistently fail[ed] to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006) (applying the *Strickland* test for ineffective assistance).

Unlike the decision to let inadmissible evidence slide into a trial without drawing the jury's attention, "a failure to object to comments on witness credibility or derogatory statements by the prosecutor is much less susceptible to the argument that it should be considered reasonable trial strategy." *Hodge*, 426 F.3d at 386. This is especially true when the objectionable conduct is essentially the core of the prosecution's closing argument. In *Hodge*, the statements at issue were quite similar to those here, with the prosecutor accusing the defendant of lying, bolstering the testimony of other witnesses, and misrepresenting testimony during closing arguments. *Id.* And so too here, the statements "were sufficiently egregious to warrant, at a minimum, an objection at the bench following the conclusion of the prosecution's rebuttal argument." *Id.*; *see also Walker v. Morrow*, 458 F. App'x 475, 487 (6th Cir. 2012) ("The soundness of counsel's strategy becomes increasingly difficult to demonstrate the more outrageous the prosecutor's conduct."). Counsel's failure to object was well outside the "range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see also Hodge*, 426 F.3d at 376 ("[T]rial counsel's failure to object to *any* of the numerous improper statements in the prosecution's closing argument is well outside this range.").

Regarding prejudice, as discussed above, *see supra* Part II.C.2.b, the prosecutor's objectionable comments pervaded his closing argument. He made Stermer's credibility and the

presentation of her out-of-court statements a central focus of the case. *See Hodge*, 426 F.3d at 384 (noting that the offending conduct must be viewed as a whole and in context). And where the evidence against a defendant is weak, prosecutorial misconduct in closing arguments is far more likely to affect the jury's deliberations and verdict. *See, e.g.*, *Walker*, 458 F. App'x 492. Given these circumstances, had Stermer's counsel objected, there is a reasonable probability that the outcome of her trial would have been different. *See Strickland*, 466 U.S. at 694. Accordingly, Stermer has shown both inadequate performance and prejudice under *Strickland*, and so is entitled to a new trial based on ineffective assistance of counsel.

### 3. Failure to Retain a Fire Expert

The district court also found that Stermer's trial counsel was ineffective for failing to retain a fire expert. *Stermer v. Warren*, 360 F. Supp. 3d at 660–69. Because AEDPA deference applies and the claim is being assessed under 28 U.S.C. § 2254(d), we cannot rely on the evidence introduced in the district court or any findings of fact it made from the federal evidentiary hearing. *See Pinholster*, 563 U.S. at 181.

For the reasons discussed below, we forego deciding the merits of this claim, since Stermer is already entitled to a new trial and the question of prejudice would raise several complicated issues of law that were never addressed in the district court. That said, the record clearly establishes that Stermer's trial counsel was deficient in refusing to call a fire expert, and but for Stermer's failure to present certain evidence in her state habeas petition, the record would show that she clearly was prejudiced by this error as well. We explain each of these points here.

#### a. Performance

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Richter*, 562 U.S. at 106; *accord Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam). This is one such case. In order to convict Stermer, the state had to prove the fire was an arson and that Stermer was the culprit. Save perhaps for testimony from one of the jailhouse informants, the only evidence supporting a finding of arson was the state's fire expert. In her state habeas petition, Stermer noted that her attorney failed to even consult with a fire expert,

despite her and her family begging him to do so and despite counsel obtaining the state expert's report and hearing his testimony at the preliminary hearing.

In defending trial counsel's actions, the state argues that presenting evidence that the fire could have been an accident would undercut the defense's strategy of blaming Todd for the fire, and so "would effectively put all the defense eggs in the basket of an accidental fire." (Resp't's Br. at 57.) This assessment both ignores defense counsel's actual strategy on this point and takes an extremely narrow view of a defendant's options in demonstrating reasonable doubt.

At trial, defense counsel argued that the state failed to prove the fire was intentionally set, but even if it had shown arson, it also failed to prove it was Linda Stermer who set the fire (as opposed to Todd). Thus, whatever credibility hit defense counsel could have taken by arguing both the accidental-fire and arsonist-Todd theories was already a necessary consequence of his strategy. The state's argument wrongly suggests that Stermer's counsel did better by presenting these theories without expert testimony to support them, and indeed, without even knowing what such an expert might have said.

Furthermore, it is a legitimate strategy to present evidence that says the fire could have been either accidental or intentional (thus injecting reasonable doubt on one front), and that assuming it was intentional, Todd was most likely the source (injecting further reasonable doubt on another front). While it might also be a fair strategy to focus on only one of these theories given the weight of the evidence, this is not a circumstance where it was a reasonable choice of counsel to make this decision without even consulting a potential expert and investigating possible evidence that the fire was accidental. And finally, the state's argument ignores the fact that an expert witness might have supported Stermer's case even if she only presented the arsonist-Todd theory.

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691; *accord, e.g.*, *Wiggins*, 539 U.S. at 521–22. In a previous arson case, this Court noted that the "most egregious type" of failure to investigate is where "lawyers altogether fail to hire [a fire] expert." *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (citing *Strickland*, 466 U.S. at 691); *see*

*also id.* at 362–63 (finding trial counsel ineffective for failing to monitor his own arson expert, since "it is inconceivable that a reasonably competent attorney would have failed to know what his expert was doing to test the State's arson conclusion"). So too here. And this is not a case like *Richter*, where "[t]here were many factual differences between prosecution and defense versions of the events" and thus "any number of hypothetical experts" who might testify, meaning it would be reasonable to focus on other issues instead of any one particular expert. 562 U.S. at 107. At Stermer's trial, the question of who (if anyone) started the fire was the central issue. And the only physical evidence supporting the state's felony murder charge was presented through the expert's assessment of the fire.

While different circumstances might dictate a different result, in this case, there was no reasonable basis for trial counsel not to have consulted a fire expert. As noted above, counsel already decided to argue that the fire could have been an accident, but then rested on the prosecution's expert, who specifically opined it was not an accident. In a duel, it might be a reasonable choice to elect a swordfight over pistols, but once you choose the latter, it makes no sense to show up without any bullets.

Where the defendant's guilt turns on a fire being arson, the state's evidence of arson is expert testimony, and the defense in fact argues (at least in part) that the fire was accidental, it is ineffective for counsel not to retain someone to help respond to the state's expert testimony. *See, e.g.*, *Strickland*, 466 U.S. at 690–91; *Wiggins*, 539 U.S. at 521–22. To buy the state's contrary arguments here would amount to an unreasonable application of *Strickland*.

### b. Prejudice

The issues are more complicated when we get to prejudice. The district court found prejudice largely based on what Stermer's post-conviction fire expert said at the federal evidentiary hearing. *Stermer v. Warren*, 360 F. Supp. 3d at 667. But under *Pinholster*, 563 U.S. at 181, we cannot rely on that evidence, and instead must assess prejudice based on the record before the state habeas court.

On appeal, the state argues that Stermer failed to establish prejudice "even assuming that, if counsel did consult with a fire expert, he would have presented that expert's testimony and that

testimony would have been that the fire was accidental." (Resp't's Br. at 60.) The state never argued that Stermer failed to show, in the state court record, that an expert would have testified that the fire could have been an accident.

If we held the state to this assumption, we would find that the state court unreasonably applied *Strickland* by denying Stermer's ineffective assistance claim. Given the weaknesses of the state's case, introducing expert testimony that the fire could have been accidental (or that, if the fire was not accidental, that it was more likely for Todd to have been the arsonist) might easily have swayed the jury to find a reasonable doubt. The state's expert testimony that the fire was arson was fundamental to its case, *see Richey*, 498 F.3d at 362, and so undercutting this evidence would have substantially increased Stermer's chances of acquittal, *see Hinton*, 571 U.S. at 275–76 (finding prejudice from the failure to present an effective expert witness and noting that the "threat [of wrongful conviction] is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses"). Viewing the evidence as a whole, there is a considerable probability that, with expert testimony suggesting the fire was accidental, Stermer's trial might have ended differently. This amounts to prejudice under *Strickland*, *see* 466 U.S. at 694, even after applying AEDPA deference.

If, however, we look past the state's assumption and turn to the state court record itself, this issue becomes significantly complicated. In the state habeas proceeding, Stermer alleged that her trial counsel refused to retain an expert, pointed out several problems with the state expert's testimony, and noted that by retaining an expert, her lawyer could have rebutted the state's expert at trial. Given these allegations, if the court denied Stermer's petition without allowing her to obtain or present evidence as to what an expert would have said on the stand, the only logical assumption would be that the state court decided Stermer loses even if an expert would have provided rebuttal testimony against the state's evidence. *See Pinholster*, 563 U.S. at 205 (Breyer, J., concurring in part and dissenting in part) ("For example, if the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a [§ 2254](d) ground) [a federal habeas] hearing might be needed to determine whether the facts alleged were indeed true."). So, if the state habeas court took Stermer's allegations as true, our analysis would be the

same as it was above when operating under the state's assumption (namely, that Stermer's expert would have said the fire might have been an accident).

But the state habeas court did not deny Stermer's petition outright. Instead, after its initial review of the case, the state court appointed post-conviction counsel for Stermer. This lawyer never supplemented the record or filed any papers with the court. *See* Mich. Ct. R. 6.505(B) ("If the court appoints counsel to represent the defendant, it shall afford counsel 56 days to amend or supplement the motion."). After the lawyer's failure to file anything, but without specifically relying on that failure, the state habeas court denied Stermer's petition.

While in several cases, the Supreme Court has found that a state-habeas attorney's failure to file can constitute cause for excusing a procedural default, *e.g.*, *Martinez v. Ryan*, 566 U.S. 1, 17 (2012); *Maples v. Thomas*, 565 U.S. 266, 289 (2012), the Court has not addressed how this principle relates to state habeas counsel's failure to present evidence or to supplement the petitioner's *pro se* filings once appointed when that does *not* result in a procedural default. And even more complicated is the question of whether the state court's rejection was based on Stermer's initial allegations alone or whether the merits decision rests on the lack of expert evidence presented in support of her case. *Cf. Babick v. Berghuis*, 620 F.3d 571, 577 (6th Cir. 2010) (noting that federal habeas counsel failed to produce a fire expert and inferring that this is because no expert would support the defendant's version of events).

Rather than wade into this AEDPA-created confusion, we decline to address the question of prejudice on Stermer's fire-expert claim, since she is already entitled to a new trial based on the prosecutor's misconduct and her counsel's failure to object. But from the district court's erroneous evidentiary hearing, we know what Stermer's expert would have said, and so the only reason she might not prevail on this claim is a further mistake of counsel and the state habeas court's failure to address that mistake. *Cf. Robinson*, 663 F.3d at 823 n.2 (noting that a state court decision might not be "on the merits" if it was decided without the key records establishing the basis for the claim).

### 4. Ineffective Assistance of Appellate Counsel

The district court also found that Stermer's counsel on direct appeal was ineffective for failing to raise the claims discussed above. *Stermer v. Warren*, 360 F. Supp. 3d at 669–70. But since the state habeas court did not deny Stermer's claims based on a procedural default, there is no need to reach the question of whether her appellate counsel was ineffective in order to grant relief on her other federal habeas claims. And since the remedy for ineffective assistance of appellate counsel as a standalone claim is only a new appeal, *e.g.*, *Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004), and here, Stermer is entitled to a new trial, her appellate ineffective assistance claim is moot.

### III. CONCLUSION

For the reasons stated above, Stermer is entitled to a new trial, and so we affirm the district court's grant of a conditional writ.

———————————

**DISSENT**

———————————

SUTTON, Circuit Judge, dissenting. With all respect to my colleagues, I do not see a plausible path for overturning Linda Stermer's murder conviction. The evidence introduced in the state court trial left no doubt that she tried to burn her husband alive and ran him over with a car in the front yard of their house when that did not work. All that was missing was a film of the mariticide. None of the constitutional claims raised in her defense ever comes to grips with the reams of evidence against her. The path gets steeper and longer when one accounts for the strictures of the Antiterrorism and Effective Death Penalty Act. Today's case, sad to say, explains why Congress felt compelled to tie the hands of federal judges in reviewing habeas claims in 1996 and why the U.S. Supreme Court should ensure that we adhere to it.

Examine the trial record, which provides chilling and "overwhelming evidence" of Linda's guilt. *Neder v. United States*, 527 U.S. 1, 17 (1999). During the months before the murder, Linda carried on an affair with her coworker, Chris Williams. In conversations with her friend Kate Fox, Linda repeatedly discussed the possibility of killing her husband, including by "running over him with her car." R. 24-10 at 185.

The day before his death, Todd Stermer discovered the affair. He told Linda to "get [her] s[---] together and get out" and that he would stay in the home with their teenage boys. *Id.* at 64. Early the next morning, Linda drove to the gas station. She bought gasoline and poured it into a container in the back of her car. Returning home, she sent her teenage sons to the store with money. The boys' father appeared to be asleep on the couch in front of the television when they left, though they could not be sure as their mother would not allow them into the room.

Soon after the boys left, neighbors spotted smoke coming from the Stermers' residence. They found the house ablaze and Linda behind the wheel of the family van on the way down the driveway. Apparently noticing the neighbors, Linda reversed direction and drove behind the house, a dead end away from any help and away from any indication she had just run him over. The indication did not last long. The neighbors found Todd Stermer lying unresponsive and

burnt in the front yard. The top and back of his head had serious cuts that looked like they came from a blunt object. The autopsy confirmed that someone ran over him with a car, and investigators found Todd's blood on the underside of Linda's van. Linda admits she ran over him but claims she didn't see him—a torched body in the front lawn of their house in the middle of an afternoon some distance away from the driveway.

In conversations with investigators and police, Linda repeatedly lied. She denied purchasing a container of gasoline on the day of the fire, denied having an extramarital affair, and gave conflicting stories about where she was when the fire started and how she got out of the house. She also veered back and forth about her interactions with Todd before his death. First she said they argued about finances. Then she told investigators that she took a nap, did the laundry, read a medical booklet, and fetched Todd a glass of juice, before he died. Ditto for their interactions during the fire. First she stated that she didn't see Todd during the blaze, and that she only heard him yell that "there [was] a fire." R. 24-10 at 44–45. Then she claimed that she *did* see Todd on fire, and that he screamed that "nobody else would ever have [her]" after him. R. 24-8 at 217.

Linda did herself no favors in conversations with Fox after the fire. She talked about sneaking into the home to retrieve a coffee mug that contained traces of a sedative she poured for Todd before his death. Her plan: Keeping the mug away from police, who were "coming to . . . the house to look for evidence the following day." R. 24-10 at 188–89.

Linda did not stop talking after she went to jail. Two inmates, Veronica Tracy and Dardeda Gordon, testified that Stermer admitted striking her husband in the back of the head. That information squared with the examiner's report, information that only the authorities and Todd's killer could have known. Neither Tracy nor Gordon received anything in exchange for their testimony, and both were interviewed after their release with no additional charges pending.

Linda Stermer tried several defenses at trial. She objected to the credibility of the prosecution witnesses and put on character witnesses of her own. She called witnesses to establish that Todd experienced fires on two properties he owned, implying he set this fire and mistakenly set himself on fire as part of an ill-fated insurance fraud scheme. But this theory

contradicted Linda's earlier account to investigators that Todd tried to kill her in a fit of rage. By then, the government had scuttled this earlier account. As the prosecutor put it, "[i]f you are going to commit a murder/suicide . . . you do the murder part first, you don't do the suicide first because then you aren't going to be able to do the murder." R. 24-11 at 120–21. And both accounts failed to explain Linda's conduct before and after Todd's death as well as Todd's blood on the bottom of the car.

Let's review the bidding. One of three things happened that day: Todd killed himself; Todd died accidentally; or Linda murdered him. No one tries to pin the death on a third person.

The idea that Todd killed himself is a non-starter. Aside from the oddity of attempting suicide by lighting oneself on fire in a house that had plenty of firearms in it, that account does not explain the lacerations on Todd's head or how he managed to make Linda's car drive over him.

The possibility of an accident suspends belief. Two remarkably unlikely events would have to happen: Todd accidentally would have to set the house (and himself) on fire, and his wife accidentally would have to drive over him in the front yard. That is a lot of bad luck, all within 24 hours of another piece of misfortune: the disclosure that Linda was having an affair.

That leaves the last possibility, the only realistic one of the three—that Linda killed Todd after he discovered her affair and told her to leave the home (and her teenage sons). Nothing in the evidence answers any of the questions that point to Linda as the murderer. Why did Linda fill a can of gasoline on the morning of Todd's death? Why did authorities find gasoline on Todd's body and on towels in the washing machine? Why did Todd suffer head wounds from a blunt instrument? Why did Linda run him over nearly fifty feet away from the home and nowhere near the driveway in broad daylight? Why, after running him over, did she park the car behind the home rather than going to fetch help? Why didn't she call the fire department or police? Why did she tell so many inconsistent stories to investigators? Why did she want to sneak back into her home to hide evidence from police? And why do so many witnesses have so many incriminating things to say?

Unable to answer any of these questions in a credible way, Linda shifts the blame to the lawyers on both sides of the case. The misconduct of the prosecutor and the incompetence of her lawyer, she insists, each requires a new trial.

But the law does not provide a way out of her predicament. Congress has prohibited federal courts from second-guessing state court criminal convictions. AEDPA's highly deferential standard applies to each of Linda Stermer's challenges to the jury verdict and the state courts' review of it. *See* 28 U.S.C. § 2254(d). Stermer can prevail only by showing her conviction was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or else was (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

1. *Prosecutorial misconduct.* Stermer alleges misconduct based on statements the prosecutor made during the closing argument. Keep in mind that arguments are not evidence. And keep in mind that the state court instructed the jury to convict based only on the evidence, not lawyer arguments. That means Stermer must show that she suffered not just "ordinary trial error" but the kind of "egregious misconduct" that "so infect[s] the trial with unfairness" as to create a "denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 647–48 (1974). She must demonstrate that this "egregious misconduct" had a tangible "effect on the trial as a whole." *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). And she must show that the state courts' rejection of these claims was clearly unreasonable under AEDPA.

*Attacks on Stermer's credibility.* Stermer takes umbrage with the prosecutor calling her a liar during closing arguments. But the Supreme Court has never indicated that statements of this sort, standing alone, give rise to constitutional error. *See Parker v. Mathews*, 567 U.S. 37, 46 (2012) (per curiam). Nor should that reality surprise anyone. Criminal trials often represent a tug of war between opposing narratives. For one narrative to prevail, the party must prove the other one is false. If prosecutors could not question a defendant's credibility, they could never win a case in which the defendant presented an alibi or contradicted the State's theory.

Prosecutors should not gratuitously cast aspersions on a defendant's character, it is true. *See United States v. Young*, 470 U.S. 1, 17–19 (1985). But that's not what happened. The prosecutor's statements about Stermer's honesty were brief, few, and peripheral to his central arguments. He stated that Stermer told "lie after lie after lie." R. 24-11 at 135. He said that "she's a liar and will lie when it suits her." *Id.* at 116. And he stated that those "accused of a very serious crime" might "say things that they perceive are going to be favorable to them." *Id.* These statements look nothing like the pattern of "pronounced and persistent [misconduct], with a probable cumulative effect upon the jury" necessary to constitute a violation redressable by habeas. *Berger v. United States*, 295 U.S. 78, 89 (1935). And the record supported each statement.

What of the prosecutor's statement that she was a "diabolical, scheming, manipulative liar and a murderer"? R. 24-11 at 136. Harsh, no doubt. Unnecessary too. A good lawyer knows that it is better to let the jurors draw these conclusions for themselves rather than to push and prod the jurors into drawing them. But given the "context of the entire trial," this one descent into impolitic and needless language did not clearly violate any Supreme Court decision or rule. *Young*, 470 U.S. at 11.

Consider each word and its connection to the evidence. "Diabolical"? The evidence showed that she drugged her husband, lit him on fire, and ran him over in the family car when the fire did not do the job. "Scheming"? The evidence showed that she discussed his murder for months, got up early in the morning to purchase the necessary gasoline, then sent her children to the store to get them out of the house. "Manipulative"? The evidence showed that she pretended to be upset while standing over Todd's dead body to win over the sympathy of onlookers at the crime scene, only to turn around and accuse *him* of trying to murder *her* when faced with tough questions about how the fire started. "Liar"? The evidence showed that she deceived investigators about her affair, about the cause of her fight with Todd, about purchasing a container of gasoline, and about her location during the fire. "Murderer"? What more can I say—and what more can the evidence show?

Truth may not always be a defense to these kinds of charges. But neither does uncouth language invariably create a reversible error, least of all in the context of AEDPA.

Compare these evidence-supported statements to cases in which the Supreme Court *rejected* prosecutorial misconduct claims that involved *far worse* transgressions. In *Darden v. Wainwright*, a prosecutor called the defendant an "animal" and said he "shouldn't be out of his cell unless he has a leash on him." 477 U.S. at 180 & n.12. He wished aloud that someone "had a shotgun" and "bl[ew] [the defendant's] head off," adding that he would enjoy seeing the defendant "sitting here with no face, blown away by a shotgun." *Id.* at 180 n.12. He also twice tipped his hat to the prospect of the defendant killing himself, once saying he wished the defendant had "used [a gun] on himself," another time referencing the defendant "cut[ting] his own throat." *Id.* The Court agreed with "every court to review" these comments that they deserved condemnation. *Id.* at 179. It nevertheless concluded that the statements did not deny the defendant a fair trial and rejected his claim. *Id.* at 183. If *Darden* did not justify habeas relief, I cannot fathom how this case could justify it.

So too of other cases. In *Donnelly v. DeChristoforo*, the prosecutor offered his personal conviction about the defendant's guilt, stating that "I honestly and sincerely believe that there is no doubt in this case, none whatsoever," that the defendant is guilty. 416 U.S. at 640 n.6. He also accused the opposing side of lying to the jury, telling them that, while defense counsel "said they hope you find [the defendant] not guilty," he "quite frankly think[s] that they hope that you find him guilty of something a little less than first-degree murder." *Id.* at 640. In doing so, he indicated to the jury that the defendant may have sought to plead guilty—information the jury would not otherwise know and information that could influence its belief in the defendant's guilt. *Id.* at 642. As in *Darden*, the Court agreed with the state courts in condemning the comments as "improper." *Id.* at 641. But because they came as "but one moment in an extended trial," it held that they did not make the trial "so fundamentally unfair as to deny him due process." *Id.* at 645. In the face of a denial of relief there, how could we grant relief here?

*Parker v. Mathews* started out as one of our own. A prosecutor, without basis in the evidence, said that the defendant lied by "exaggerat[ing] his fears about his wife [and] his mother-in-law" and by "overstat[ing] the extent of his intoxication to his psychiatrist." 567 U.S.

at 47. The prosecutor also denigrated the defendant's emotional disturbance defense by calling it a "defense of last resort," adding that the defendant had "no excuse for his conduct." *Id.* A panel of this court granted habeas on that ground. But the Supreme Court unanimously reversed. "[D]ue process," it ruled, does not "prohibit[] a prosecutor from emphasizing a criminal defendant's motive to exaggerate exculpatory facts." *Id.* And "even if" the prosecutor's comments "direct[ed] the jury's attention to inappropriate considerations," that would still not suffice for purposes of AEDPA. *Id.* What was true in *Parker*—what was true in each of these U.S. Supreme Court cases—is true here.

*Improper vouching.* Stermer adds that the prosecutor improperly vouched for testimony when he stated that he "would submit that [one witness] clearly appears to be a very credible person who has recall of the incident," R. 24-11 at 120, and when he said of the jailhouse witnesses that they had "no incentive to lie," and that "[t]here is absolutely nothing in it for them to make this up." *Id.* at 133. None of this is impermissible in the first instance. The prosecutor did not affix the "imprimatur of the Government" to the witness's statements, "convey the impression that evidence not presented to the jury, but known to the prosecutor," corroborated the witness's testimony, or otherwise "induce the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18–19. The prosecutor simply provided the jury a way of thinking about evidence it had already heard. The prosecutor pointed out one witness's effective "recall" while reminding the jury that it "had an opportunity to judge [the witness's] credibility" for itself. R. 24-11 at 120. He likewise refreshed the jury's recollection of evidence suggesting the jailhouse witnesses did not have ulterior motives to testify by noting that they were "out of jail" and had "nothing pending." *Id.* at 133. Prosecutors legitimately make statements like these all the time so long as they don't "manipulate or misstate the evidence" in the process. *Darden*, 477 U.S. at 182.

Even if these statements crossed the line (they did not), Stermer still would lose. She does not show, she does not even try to show, how these two statements could have caused the jury to "stray from its responsibility to be fair and unbiased." *Young*, 470 U.S. at 18.

*Factual misstatements.* Stermer points to two alleged factual misstatements by the prosecutor during closing argument. In one, the prosecutor questioned Stermer's decision never to call for help, stating that "the lady who has two cell phones . . . [has them] in the van according to [] her. Possible? Yes. Convenient? Very." R. 24-11 at 126. She points out that no evidence supported her phones being in the van. And she's right. But her challenge to this misstatement confounds. The prosecutor did not mean to prove that the phones were in the car; he meant to question why she never called for help. To the extent this statement inclined the jury to believe she had left her phones in the van, that's all the better for her case. This would make her decision not to call the fire department while inside the house a hair more logical. It's no wonder her counsel never objected to the point.

The prosecutor also said that he knew of "no evidence" that two previous fires associated with Todd Stermer involved "arson." R. 24-11 at 176–77. He was telling the truth. Yes, Todd's mother, Sandra, testified that two of Todd's prior properties had burned. And yes, Detective Gabrielle Rought testified that Todd had received money from one of the fires. But neither piece of evidence indicates that the cause of those fires was arson.

Stermer attempts to counter this last conclusion by pointing to a police report in which a detective told a trooper that he thought Todd might have been "regarded as the suspect" in the burning of one of his properties. R. 20-13 at 2. But even if Linda Stermer could have admitted that double-hearsay statement into the record, *cf. Mayor of City of Phila. v. Educ. Equal. League*, 415 U.S. 605, 618 (1974), the fact remains that she did not. The prosecutor cannot be blamed for making no reference to the report in his closing argument.

2. *Ineffective assistance.* Also unavailing is Stermer's claim of ineffective assistance of counsel. To prevail, she must show that counsel performed "unreasonabl[y]" and that the defective performance "prejudiced" the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 698–99 (1984). This review becomes doubly deferential when we add AEDPA to the mix. *See* 28 U.S.C. § 2254(d)(1). The "question is no longer whether [a] counsel's actions were reasonable," but instead whether there could exist any "fairminded" argument that trial counsel "satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 103, 105–06 (2011).

*Performance.*  Faced with overwhelming evidence of guilt, Stermer's counsel did as well as anyone could reasonably expect.  He ably cross-examined the State's 24 witnesses, pointing out passing gaps in their recollection, occasional inconsistencies in their narratives, and potential ulterior motives for testifying.  He called 11 witnesses to cast doubt on the government's case, to vouch for Stermer's character, and to give another explanation for the fire.

That was not enough, she insists.  He should have consulted an arson expert to counteract the prosecution's testimony that the fire stemmed from arson, not an accident.  But counsel need not pursue every defense strategy imaginable to satisfy the Sixth Amendment.  Lawyers often must make "reasonable decision[s]" as to what approach to take, rendering "particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  Decisions of this sort come with a "heavy measure of deference to counsel's judgments."  *Id.*

With or without deference, the decision not to call an arson expert made plenty of sense.  On the morning of the murder, Linda Stermer went to the local gas station and filled a tank with gasoline.  Investigators discovered gasoline all over Todd's body as well as on towels in the washer downstairs.  In the face of this evidence, the notion that the fire started accidentally pushes credulity to the collapsing point.  Small chance Stermer's counsel could find a competent arson expert willing to testify affirmatively to that effect.  To this day, whether then or now, she still has not identified anyone who could back up such a tall tale.  That's all anyone needs to know.

Given these realities, Stermer's counsel made the strategic choice to admit that arson occurred but that Todd caused it.  This theory had issues too; every theory did.  But at least this theory helped to explain the presence of the gasoline on Todd's body and on the towels in the washing machine.  Choosing the best among several tough options does not establish ineffective assistance.  Even on direct review, such strategic decisions are "virtually unchallengeable."  *Id.* at 690.

*Prejudice.* Stermer comes up woefully short on proving prejudice anyway. When the State introduces "overwhelming" evidence against a defendant, a court may safely deduce that counsel's failure to introduce additional evidence would not have changed anything—and might have made it worse. *See id.* at 696. This case is Exhibit A for the point. At oral argument in our court, Stermer described her best-case scenario as finding an arson expert prepared to testify that the cause of the fire could not be conclusively determined. But that testimony would have wilted against the State's case for many of the reasons already given. Here's one more. What arson expert could explain how her husband's body ended up under her van? No reasonable juror would have ruled differently based on the addition of an arson expert.

I respectfully dissent.