*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LINDA KAY STERMER,

Defendant-Appellant.

UNPUBLISHED
March 16, 2023

No. 361326
Van Buren Circuit Court
LC No. 2009-016654-FC

Before: M. J. KELLY, P.J., and JANSEN and CAMERON, JJ.

PER CURIAM.

In this interlocutory appeal, defendant, Linda Kay Stermer, appeals by delayed leave granted[1] the trial court's order denying her motion to strike the testimony of Sergeant Scott LeRoy, the prosecution's fire-investigation expert. She also appeals the court's order denying her motion to exclude the admission of Dardeda Gordon's prior testimony. On appeal, Stermer argues that the trial court abused its discretion by denying the motion to exclude LeRoy's testimony because his opinion was not based on sufficient facts or data and because he failed to apply appropriate principles and methods to the facts of the case as required by *Daubert v Merrell Dow Pharm Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). Stermer also asserts that the court abused its discretion by denying the motion to exclude Gordon's prior testimony because Stermer's trial lawyer did not have a fair opportunity to cross-examine the witness at Stermer's first trial. For the reasons explained in this opinion, we affirm.

## I. BASIC FACTS

This appeal concerns the parties' dispute about evidence that will be admitted at Stermer's second trial for the first-degree murder of her husband, Todd Stermer. Todd died on Sunday, January 7, 2007, as the result of injuries he sustained in a fire that occurred at the Stermer family home in Lawrence, Michigan. According to Stermer, she was in the basement doing laundry when

---

[1] *People v Stermer*, unpublished order of the Court of Appeals, entered October 18, 2022 (Docket No. 361326).

-1-

she heard Todd scream in the living room. She ran up the stairs and observed that the living room between Todd's recliner and the master bedroom was on fire. Todd's upper body was on fire, but she could not see him well because the area was filled with fire and smoke. Stermer ran out the front door and jumped into Todd's van to get help.

Stermer started backing up. However, she saw Todd in the yard, so she pulled forward quickly and jumped out to see if she could help him. Todd was trying to pull off his pants and socks. He did not follow her command to lay down. Stermer then jumped back in the van, but she was unable to back up because the ground was muddy. She then saw Todd laying on the ground, so she again got out of the van and ran to him. He was not on fire anymore. At this point, Stermer saw neighbors pulling up the driveway and screamed at them to call 911.

Mike Matheny, one of the neighbors, saw the fire and came to the Stermer residence to help. When he arrived, he observed that Todd was badly burned and completely naked. He retrieved some clothing from his vehicle and draped it over Todd. First responders used a plastic "sled" or "boat" to move Todd's body farther from the house. Todd died at the scene. The forensic pathologist determined that Todd's cause of death was the thermal injuries he suffered and the inhalation of smoke during the fire. In addition, Todd suffered blunt-force injuries, including four lacerations to his scalp and two rib fractures. The blood discovered below the bumper on the van was a match for Todd.

LeRoy, a fire investigator with the Michigan State Police, smelled some sort of petroleum liquid accelerant that seemed to be coming from Todd's sweatpants. He collected the sweatpants for testing. Todd's sweatpants, socks, and underwear tested positive for gasoline. A shirt that was mistakenly placed with Todd's clothing also tested positive, while the rest of the clothing draped over Todd tested negative. Stermer's clothing also tested negative. LeRoy concluded that the fire was intentionally set in the living room with gasoline as an accelerant.

Stermer was arrested and charged for Todd's murder. Her trial occurred in January 2010. The prosecution's theory was that Stermer and Todd were having issues in their marriage, and that Stermer wanted to dispose of Todd. As a result, she struck Todd with a blunt object while he was asleep and then set him on fire. Subsequently, after Todd escaped the fire, Stermer ran him over with the van. After a five-day trial in which both sides presented extensive witnesses and evidence, the jury found Stermer guilty of first-degree felony murder. Stermer was sentenced to life imprisonment without the possibility of parole.

After exhausting her direct appeals, Stermer filed a petition for a writ of habeas corpus under 28 USC 2254. Following an evidentiary hearing, the federal district court granted Stermer's request for a new trial on the basis of prosecutorial misconduct and ineffective assistance of counsel. *Stermer v Warren*, 360 F Supp 3d 639, 645-646 (ED Mich, 2018). The United States Court of Appeals for the Sixth Circuit affirmed the district court's grant of a new trial. *Stermer v Warren*, 959 F3d 704, 741 (CA 6, 2020).

In preparation for her new trial, Stermer moved to strike LeRoy's testimony, arguing that his methodology in determining the origin and cause of the fire was inconsistent with MRE 702, the scientific method, the National Fire Protection Association's 921 Guide for Fire and Explosion Investigations (NFPA 921), and NFPA's 1033 Standard for Professional Qualifications for Fire

Investigator (NFPA 1033).[2]  Following a two-day hearing, the trial court denied the motion in a written opinion and order.  Thereafter, Stermer sought to exclude prior testimony from Gordon, who had since died, from being read into the record at her second trial.  The trial court also denied this motion.  Stermer filed motions for reconsideration for each of these orders, which the court denied.

## II. ADMISSION OF EVIDENCE

### A. STANDARD OF REVIEW

Stermer argues that the trial court abused its discretion by denying her motion to strike LeRoy and Gordon's testimony.  "The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).  An abuse of discretion occurs "when the court chooses an outcome that falls outside the range of principled outcomes." *People v Douglas*, 496 Mich 557, 565; 852 NW2d 587 (2014) (quotation marks and citation omitted).  "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Aldrich*, 246 Mich App at 113.  Constitutional issues are reviewed de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018).

### B. EXPERT TESTIMONY

Stermer first argues that the trial court abused its discretion by allowing the admission of LeRoy's testimony.  We disagree.

MRE 702, which concerns the admissibility of expert testimony, provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As it relates to the admission of expert testimony, the Michigan Supreme Court has explained:

> A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable.  The overarching goal is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that

---

[2] The NFPA is a nonprofit organization that strives to minimize the risk and effects of fire.  The NFPA has developed approximately 300 codes and standards concerning fire and related hazards. National Fire Protection Association, *NFPA Overview* <https://www.nfpa.org/overview> (accessed February 22, 2023).

characterizes the practice of an expert in the relevant field. Because there are many different kinds of experts and expertise, this inquiry is, by necessity, a flexible one, and a court determining the admissibility of expert testimony may consider reliability factors pertinent to the particular type of expert testimony offered and its connection to the particular facts of the case. [*People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012) (quotation marks and citations omitted; alteration in original)].

MRE 703 requires that the "facts or data in the particular case upon which an expert bases an opinion or interference shall be in evidence."

In this case, the trial court determined that LeRoy possessed the proper qualifications to offer an expert opinion as a fire investigator. LeRoy became a fire investigator with the Michigan State Police in 2001. He worked in that capacity for many years until he retired and started working for a private company. He taught fire-investigation courses when he was employed with the Michigan State Police. He was also a published author on the subject of methamphetamine fires. He had over 559 hours of specialized training and 680 hours of continuing education training. He testified 46 times as an expert in fire investigation. He was also a member of two professional fire-investigation organizations. As a result, the court did not abuse its discretion by determining that LeRoy possessed the requisite training to testify as an expert in fire investigation.

The core dispute in this case concerns LeRoy's alleged failure to strictly adhere to the guidelines outlined in the NFPA 921. The parties appear to agree that the NFPA 921 provides the accepted standards fire investigation. Moreover, the parties also seem to agree that LeRoy failed to strictly adhere to the guidelines in the NFPA. Stermer asserts that this failure makes LeRoy's methodology unreliable and, therefore, his testimony is inadmissible. The prosecution, however, argues that the failure to follow the guidelines in the NFPA merely goes to the weight of LeRoy's testimony and does not automatically render it inadmissible.

The failure to strictly adhere to the guidelines in the NFPA does not automatically render the opinion of a fire investigator unreliable under MRE 702. Indeed, in *Barr v Farm Bureau Gen Ins Co*, 292 Mich App 456, 459-460; 806 NW2d 531 (2011), this Court held that a fire investigator's testimony was admissible, even though the investigator acknowledged that this methodology deviated from the NFPA 921, because the investigator explained how and why his methodology deviated and deviations from the procedures in the NFPA 921 were permitted as long as they were justified.

During the *Daubert* hearing, LeRoy detailed his investigation in this case. He examined Todd when he arrived at the scene. He smelled gasoline that appeared to be emanating from Todd's sweatpants. He collected Todd's clothing for testing, and he examined the home to determine where the fire caused the most damage. LeRoy determined that the fire started in the living room because the flooring and ceiling were consumed by the fire in that room, which was corroborated by the statement provided by Stermer. Ultimately, LeRoy opined that the fire was intentionally set on the basis of the speed of the fire, the unexplained existence of gasoline on Todd's sweatpants, and the fact that the fire occurred in the afternoon while two able-bodied adults were present.

To the extent that Stermer asserts that LeRoy's methodology was unreliable because he was unable to pinpoint the precise location where the fire started in the living room, the NFPA 921 allows for such a situation, providing that in some situations, the extent of the damage may reduce the ability to specifically identify the point of origin, but it still may be possible to determine credible origin and cause hypotheses.

In addition, LeRoy considered and ruled out alternative hypotheses. LeRoy examined the living room's fireplace and chimney, but he did not observe any damage. Similarly, he investigated the fuel furnace in the basement, where a police canine indicated that there was accelerant present. However, the area around the furnace was undamaged and Stermer did not observe any fire in the basement. As for the presence of the gasoline on Todd's sweatpants, LeRoy stated that he did not believe that the gasoline was transferred by the neighbor's clothing or the plastic boat or sled used to move Todd away from the house because the only clothing that tested positive for gasoline was placed in the same bag. Stermer's clothing and the remainder of the neighbor's clothing tested negative despite the contact between that clothing and Todd after the fire. Finally, LeRoy did not believe that the fire was caused by the electrical system because that would not explain the amount of fire Stermer described.

Stermer asserts that LeRoy improperly concluded that the ignition source was an open flame without any supporting evidence; however, the NFPA 921 allows for such inferences under certain conditions. One provided example describes an instance in which an ignitable liquid residue is found at one or more locations within the fire scene and its presence does not have an innocent explanation. In this case, LeRoy believed that because of Todd's severe burns, he was either at or near the area of origin. He further stated his belief that the gasoline on Todd's pants did not have an innocent explanation.

LeRoy acknowledged during his testimony that he failed to properly document his excavation of the debris located in the basement. In any event, he testified that he did not discover anything of value. He believed that the living room flooring had been completely destroyed in the fire so that he would be unable to test it for accelerant. As for the additional evidence, including the neighbors' affidavits stating that they did not smell gasoline when they encountered Todd and that one of Todd and Stermer's children testified that he smelled gasoline before the fire, such possibilities go to the weight of the evidence, which the defense can investigate during cross-examination or through its own expert. See *People v Yost*, 278 Mich App 341, 364; 749 NW2d 753 (2008).

In sum, LeRoy testified that he followed the scientific method and the guidelines of the NFPA 921 while he conducted his investigation in this case. The trial court carefully considered the available evidence and determined that there was no basis to preclude LeRoy's testimony concerning the cause of the fire. That ruling was not an abuse of discretion in light of the circumstances present in this case.

## C. UNAVAILABLE WITNESS

Stermer next asserts that the trial court abused its discretion by allowing Gordon's testimony from her first trial to be read into the record at her second trial. We disagree.

"A defendant has the right to be confronted with the witnesses against him or her." *Yost*, 278 Mich App at 369. See also US Const, Am VI; Const 1963, art 1, § 20. "The right of confrontation insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness." *Yost*, 278 Mich App at 370 (quotation marks and citations omitted). "The Sixth Amendment bars testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *Id*. "Unavailability as a witness" includes the situation in which the declarant is "unable to be present or to testify at the hearing because of death . . . ." MRE 804(a)(4).

Gordon is deceased and will be unable to testify at Stermer's second trial. Therefore, the pertinent question on appeal is whether Stermer "had a prior opportunity to effectively cross-examine" Gordon. *Yost*, 278 Mich App at 370. She asserts that the prosecution failed to provide the defense with information related to Gordon's criminal history and inconsistent statements Gordon made in her interview with law enforcement. The prosecution denies this allegation. Regardless, the record reflects that Stermer's trial lawyer did question Gordon during cross-examination about her criminal history and her police interview.

At Stermer's first trial, Gordon testified that she became acquainted with Stermer while the two were in the Van Buren County Jail in 2009. Gordon stated that she was in jail for failing to pay fines and costs related to another conviction. According to Gordon, Stermer initially indicated that she had nothing to do with her Todd's death. However, Stermer's story later changed. Stermer stated that she struck Todd during an altercation and gave him medicine. She then started the fire with gasoline while Todd was asleep. On cross-examination, Gordon testified that she was incarcerated for failing to pay restitution for a conviction of uttering and publishing. She stated that she cashed a check that she did not know was stolen, but she admitted that she pleaded guilty to the charge. Stermer's trial lawyer asked Gordon if she had any other theft-related convictions or convictions for crimes involving dishonesty. She stated that she had a misdemeanor conviction of shoplifting from Walmart.

Stermer argues that Gordon's testimony was untruthful because she was in jail in 2009 after pleading guilty to misdemeanor assault. Gordon also failed to mention that she had two retail fraud convictions. Nonetheless, Stermer's trial lawyer did question Gordon about her criminal history and she admitted that she had previous convictions involving dishonesty. Additionally, Stermer's trial lawyer questioned Gordon about inconsistent statements she made during her interview with the investigating detective. She initially stated that Stermer asked for forgiveness, but she could not remember any other details. It was not until the detective suggested that Stermer struck Todd with an object that Gordon provided additional information that she later presented at trial. Moreover, Gordon admitted that she suffered from both physical and mental-health issues and that she was unable to take her medications while she was in jail. She conceded that she struggled with her memory. Gordon also affirmed that she was placed in the holding cell with Stermer for disciplinary reasons.

Thus, the trial transcript shows that Stermer's trial lawyer impeached Gordon's credibility by asking about her criminal history, physical and mental-health issues, and her prior inconsistent statements. As a result, Stermer's trial lawyer effectively cross-examined on the relevant issues. Further, because the testimony occurred at Stermer's first criminal trial, Stermer's trial lawyer had

a similar motive to develop Gordon's testimony during cross-examination. MRE 804(b)(1). Therefore, the trial court did not deprive Stermer of her right to confront Gordon by permitting the prosecution to read her testimony from the first trial at Stermer's new trial. As a result, the trial court did not abuse its discretion by denying Stermer's motion in limine concerning Gordon's testimony.

Affirmed.

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Thomas C. Cameron